# UNITED STATES *v.* MAURO ET AL.

No. 76–1596.   Argued February 27, 1978—Decided May 23, 1978*

*Together with No. 77–52, *United States* v. *Ford,* also on certiorari to the same court.

342

WHITE, J., delivered the opinion of the Court, in which BRENNAN, STEWART, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed an opinion concurring in the judgment in No. 76–1596 and dissenting in No. 77–52, in which BURGER, C. J., joined, *post*, p. 365.

*Deputy Solicitor General Frey* argued the cause for the United States in both cases. With him on the briefs were *Solicitor General McCree, Assistant Attorney General Civiletti, H. Bartow Farr III, Jerome M. Feit,* and *Elliott Schulder.*

*Kevin G. Ross* argued the cause and filed a brief for re-respondents, *pro hac vice,* in No. 76–1596. *David J. Gottlieb* argued the cause for respondent, *pro hac vice,* in No. 77–52. With him on the brief were *William E. Hellerstein* and *Phylis Skloot Bamberger.*

MR. JUSTICE WHITE delivered the opinion of the Court.

In 1970 Congress enacted the Interstate Agreement on Detainers Act, 18 U. S. C. App., pp. 1395–1398 (1976 ed.), joining the United States and the District of Columbia as parties to the Interstate Agreement on Detainers (Agreement).[1] The Agreement, which has also been enacted by 46 States, is designed "to encourage the expeditious and orderly disposition of . . . charges [outstanding against a prisoner] and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Art. I. It prescribes procedures by which a member State may obtain for trial a prisoner incarcerated in another member jurisdiction and by which the prisoner may demand the speedy disposition of certain charges pending against him in another jurisdiction. In either case, however, the provisions of the Agreement are triggered only when a "detainer" is filed with the custodial (sending) State by another State (receiving) having untried charges pending against the prisoner; to obtain

---

[1] The Interstate Agreement on Detainers Act contains eight sections. Section 2 sets forth the Agreement as adopted by the United States and by other member jurisdictions. Provisions of the Agreement will be referred to herein by their original article numbers, as set forth in § 2 of the enactment of Congress.

temporary custody, the receiving State must also file an appropriate "request" with the sending State. The present cases concern the scope of the United States' obligations under the Agreement, and in particular pose the question whether a writ of habeas corpus *ad prosequendum,* used by the United States to secure the presence in federal court of state prisoners, may be considered either a "detainer" or a "request" within the meaning of the Agreement.

I

A

Respondents in No. 76–1596, Mauro and Fusco, were indicted for criminal contempt in the United States District Court for the Eastern District of New York on November 3, 1975.[2] At the time of their indictments, both men were serving state sentences at New York correctional facilities.[3] On November 5, 1975, the District Court issued separate writs of habeas corpus *ad prosequendum,* directing the wardens of the prisons where Mauro and Fusco were incarcerated to produce them before the District Court on November 19, 1975. Mauro and Fusco were arraigned in the District Court on November 24, 1975, at which time they both entered pleas of not guilty. Following their arraignment, they were retained in federal custody at the Metropolitan Correctional Center in New York City.

On December 2, 1975, respondents again appeared before the District Court, this time for the purpose of setting a trial date. After trial dates had been established, the court, noting

---

[2] The criminal contempt charges arose out of the refusal of Mauro and Fusco, despite a judicial grant of immunity, to testify before a federal grand jury investigating violations of the federal drug laws.

[3] Mauro was serving a sentence of three years to life imprisonment at the Auburn, N. Y., Correctional Facility, and Fusco was serving a sentence of one year to life imprisonment at the Clinton Correctional Facility in Dannemora, N. Y.

the overcrowded conditions at the federal Metropolitan Correctional Center, directed that Mauro and Fusco be returned to their respective state prisons until shortly before their trials.

On April 26, 1976, Mauro was again removed from state prison and taken before the District Court pursuant to a writ of habeas corpus *ad prosequendum,* as was Fusco on April 29, 1976. Prior to these appearances, respondents had moved for dismissal of their indictments on the ground that the United States had violated Art. IV (e) of the Agreement by returning them to state custody without first trying them on the federal indictment.[4] The District Court granted their motions to dismiss the indictments, finding that the Agreement governed their removal from state custody by means of the writs of habeas corpus *ad prosequendum* and that the Government had violated the provisions of Art. IV (e).

On appeal a divided panel of the Court of Appeals for the Second Circuit affirmed the dismissals of respondents' indictments. 544 F. 2d 588 (1976). It held that a "writ of *habeas corpus ad prosequendum* is a detainer entitling the state inmate to the protection provided in Article IV [of the Agreement] and specifically to a trial before his return to the state institution." *Id.,* at 592 (footnote omitted). To hold that a writ of habeas corpus *ad prosequendum* was not a detainer within the meaning of the Agreement, reasoned the court, would permit the United States to circumvent its obligations under the Agreement.

## B

Respondent in No. 77–52, Ford, was arrested in Chicago on October 11, 1973, on two federal warrants.[5] Shortly after his

---

[4] Article IV (e) requires the dismissal of the indictment against a prisoner who is obtained by a receiving State if he is returned to his original place of imprisonment without first being tried on the indictment underlying the detainer and request by which custody of the prisoner was secured. See *infra,* at 352–353.

[5] One of the warrants, issued in the Southern District of New York, was

arrest, he was turned over to Illinois authorities for extradition to Massachusetts on older, unrelated state charges. While in the custody of the Illinois authorities, Ford requested a speedy trial on the federal bank robbery charge by means of letters sent to the United States Attorney for the Southern District of New York and the United States District Court for that District.[6] After he was transferred to Massachusetts, federal officials lodged the federal bank robbery warrant as a detainer against him with the state prison authorities.

Following Ford's conviction on the Massachusetts charges, an indictment was filed in the United States District Court for the Southern District of New York, charging Ford with bank robbery and aggravated bank robbery. On April 1, 1974, he was produced from Massachusetts for arraignment before the District Court pursuant to a writ of habeas corpus *ad prosequendum* issued by the court on March 25, 1974. Because Ford was not represented by counsel, the proceedings were adjourned until April 15, at which time he pleaded not guilty to a superseding indictment.[7] Trial was set for May 28, 1974.

The trial did not commence, however, until September 2, 1975, having been postponed on five separate occasions either at the request of the Government or on the court's own initia-

---

for bank robbery; the other, issued in the District of Massachusetts, was for unlawful flight. The latter charge was eventually dismissed.

[6] In these letters, Ford stated that he was in the custody of state officials in Illinois, awaiting extradition to Massachusetts to stand trial for escape. He requested the court and the United States Attorney to take action on the federal bank robbery charge against him, either bringing him to trial or dropping the charge. This request, said Ford, was based on his constitutional right to a speedy trial.

[7] The superseding indictment was filed against Ford on April 3, 1974. It charged him and one James R. Flynn with the same bank robbery that had been charged in the first indictment and also with use of a firearm in the commission of a bank robbery, interstate transportation of a stolen vehicle, and conspiracy to commit the above offenses.

tive.[8] During the period while he was awaiting his federal trial, Ford was incarcerated in the Massachusetts state prison; he had requested and received permission to return there in order to facilitate preparation for trial. On November 4, 1974, in response to the Government's motion to postpone the trial for a third time, Ford moved in the District Court for the dismissal of his indictment on the ground that he had been denied his right to a speedy trial.[9] In support of his motion, he alleged that he was being denied furlough privileges at the state prison as a result of the federal detainer that remained lodged against him. His motion to dismiss the indictment was denied.

On August 8, 1975, the Government secured Ford's presence for trial from the Massachusetts prison authorities by means of a writ of habeas corpus *ad prosequendum* issued by the District Court. At the beginning of his trial, Ford again moved unsuccessfully for a dismissal of the indictment on speedy trial grounds. His jury trial resulted in verdicts of guilty on all counts.

---

[8] On May 17, 1974, the Government moved to adjourn the trial for a period of 90 days or until codefendant Flynn could be apprehended, whichever occurred first. The motion was granted, and the trial was rescheduled for August 21, 1974. The second postponement resulted from the reassignment of the case to a different judge in August 1974; trial was then reset for November 18, 1974. On November 1, however, the Government requested an additional 90-day adjournment in order to apprehend Flynn. The District Court granted the Government's motion, over Ford's objections, and set a new trial date of February 18, 1975. Because the District Judge was engaged in a lengthy stock-fraud trial on February 18, the trial was again postponed; it was rescheduled for June 11, 1975. The trial was postponed for a final time, until September 2, 1975, because of the District Court's decision to undertake a "crash" program for the disposition of pending civil cases.

[9] In his motion Ford contended that he had been denied his rights to a speedy trial as guaranteed to him by the Federal Constitution and the Rules of the Southern District of New York.

On appeal to the Court of Appeals for the Second Circuit, Ford argued, among other things, that his indictment should have been dismissed with prejudice because he was not tried within 120 days of his initial arrival in the Southern District of New York, in violation of Art. IV (c) of the Agreement,[10] and because he was returned to state prison without first being tried on the federal charges, in violation of Art. IV (e). The panel,[11] with one judge dissenting, agreed with Ford's contention that dismissal of the indictment was required as a result of the Government's failure to comply with the speedy trial provisions of Art. IV (c).[12]  550 F. 2d 732 (1977). The court reasoned that, regardless of whether a writ of habeas corpus *ad prosequendum* issued by a federal court to obtain a state prisoner is by itself sufficient to trigger the provisions of the Agreement, the Agreement clearly governs situations such as Ford's, in which a federal detainer is first filed with the state authorities and the writ is then used to secure the prisoner's presence in federal court. In the view of the Court of Appeals, the writ of habeas corpus *ad prosequendum* utilized to bring Ford to federal court was a "written request for temporary custody or availability" within the meaning of Art. IV (a). Having concluded that the Agreement was applicable and that the provisions of Art. IV (c) had been violated, the Court of Appeals reversed and remanded for the dismissal of Ford's indictment with prejudice, as required by Art. V (c) of the Agreement.[13]

---

[10] For the text of Art. IV (c), see *infra,* at 352.

[11] The opinion for the Court of Appeals was written by Judge Mansfield, who had dissented from the Second Circuit's disposition of the *Mauro* and *Fusco* cases.

[12] The Court of Appeals held that, while Ford had waived his claim under Art. IV (e) by requesting the return to state prison, he had not waived his Art. IV (c) claim, for he had repeatedly insisted on a prompt trial.

[13] See *infra,* at 353.

## C

Because there is a conflict among the Federal Courts of Appeals on the issue,[14] we granted certiorari [15] in these cases to consider whether the Agreement governs the use of writs of habeas corpus *ad prosequendum* by the United States to obtain state prisoners. In No. 76–1596 we hold that such a writ issued by a federal court to state authorities, directing the production of a state prisoner for trial on criminal charges, is not a detainer within the meaning of the Agreement and thus does not trigger the application of the Agreement. In No. 77–52 we hold that the United States is bound by the Agreement when it activates its provisions by filing a detainer against a state prisoner and then obtains his custody by means of a writ of habeas corpus *ad prosequendum*.

## II

The origins of the Agreement date back to 1948, when à group known as the Joint Committee on Detainers [16] issued a report concerning the problems arising from the use of detainers and expressing five aims or principles for the guidance of

---

[14] In addition to the Court of Appeals for the Second Circuit, the Court of Appeals for the Third Circuit has held that a writ of habeas corpus *ad prosequendum* is a detainer within the meaning of the Agreement. *United States* v. *Sorrell*, 562 F. 2d 227 (1977) (en banc), cert. pending, No. 77–593. The other Courts of Appeals that have considered the question have concluded that an *ad prosequendum* writ does not by itself trigger the application of the Agreement. *Ridgeway* v. *United States*, 558 F. 2d 357 (CA6 1977), cert. pending, No. 77–5252; *United States* v. *Kenaan*, 557 F. 2d 912 (CA1 1977), cert. pending, No. 77–206; *United States* v. *Scallion*, 548 F. 2d 1168 (CA5 1977), cert. pending, No. 76–6559.

[15] 434 U. S. 816 (1977).

[16] This committee was made up of representatives from the following organizations: Parole and Probation Compact Administrators Association, National Association of Attorneys General, National Conference of Commissioners on Uniform State Laws, American Prison Association, and the Section on Criminal Law of the American Bar Association.

prosecuting authorities, prison officials, and parole authorities. These guiding principles, which later served as the underpinnings of the Agreement, were as follows:

"1. Every effort should be made to accomplish the disposition of detainers as promptly as possible.

"2. There should be assurance that any prisoner released to stand trial in another jurisdiction will be returned to the institution from which he was released.

"3. Prison and parole authorities should take prompt action to settle detainers which have been filed by them.

"4. No prisoner should be penalized because of a detainer pending against him unless a thorough investigation of the detainer has been made and it has been found valid.

"5. All jurisdictions should observe the principles of interstate comity in the settlement of detainers, and each should bear its own proper burden of the expenses and effort involved in disposing of the charges and settling detainers." Bennett, The Last Full Ounce, 23 Fed. Prob. 20, 22 (June 1959).

The Joint Committee on Detainers was later reconstituted under the auspices of the Council of State Governments. Then known as the Committee on Detainers and Sentencing and Release of Persons Accused of Multiple Offenses, it held meetings in 1955 and 1956, which resulted in the development and approval of several proposals concerning detainers. Among the proposals was a draft version of the Agreement. In April 1956 this proposal was reviewed and approved by a conference jointly sponsored by the American Correctional Association, the Council of State Governments, the National Probation and Parole Association, and the New York Joint Legislative Committee on Interstate Cooperation.[17]   Follow-

---

[17] Among the 60 persons in attendance at the conference were representatives of the United States Department of Justice.

ing the endorsement of the Agreement by this conference, the Council of State Governments included it within its Suggested State Legislation Program for 1957.

The Agreement, in the form adopted by the United States and other member jurisdictions, sets forth the findings upon which it is based and its purpose in Art. I. It notes that "charges outstanding against a prisoner, detainers based on untried indictments, informations, or complaints and difficulties in securing speedy trial of persons already incarcerated in other jurisdictions, produce uncertainties which obstruct programs of prisoner treatment and rehabilitation." Accordingly, its purpose is to encourage the expeditious disposition of such charges and to provide cooperative procedures among member States to facilitate such disposition.

The central provisions of the Agreement are Art. III and Art. IV. Article III provides a procedure by which a prisoner against whom a detainer has been filed can demand a speedy disposition of the charges giving rise to the detainer. The warden of the institution in which the prisoner is incarcerated is required to inform him promptly of the source and contents of any detainer lodged against him and of his right to request final disposition of the charges. Art. III (c). If the prisoner does make such a request, the jurisdiction that filed the detainer must bring him to trial within 180 days.[18] Art. III (a). The prisoner's request operates as a request for the final disposition of all untried charges underlying detainers filed against him by that State, Art. III (d), and is deemed to be a waiver of extradition. Art. III (e).

Article IV provides the means by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges. Once he has filed a detainer against the prisoner,

---

[18] For good cause shown in open court, with either the prisoner or his counsel present, the court having jurisdiction over the matter may grant any necessary or reasonable continuance.

the prosecutor can have him made available by presenting to the officials of the State in which the prisoner is incarcerated "a written request for temporary custody or availability. . . ." [19] Art. IV (a).

Two important limitations, previously referred to, are placed on a prosecuting authority once it has obtained the presence of a prisoner pursuant to Art. IV. Article IV (c) states that

> "[i]n respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

And Art. IV (e) requires the receiving State to try the prisoner on the outstanding charge before returning him to the State in which he was previously imprisoned:

> "If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V (e) hereof, such indictment, informa-

---

[19] Article IV (a) states:

"The appropriate officer of the jurisdiction in which an untried indictment, information, or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party State made available in accordance with article V (a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the State in which the prisoner is incarcerated: *Provided,* That the court having jurisdiction of such indictment, information, or complaint shall have duly approved, recorded, and transmitted the request: *And provided further,* That there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the Governor of the sending State may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner."

tion, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

Article V (c) similarly provides that the "indictment, information, or complaint on the basis of which the detainer has been lodged" shall be dismissed if the prisoner is not brought to trial within the period specified in Art. IV (c).

## III

Congress enacted the Agreement into law and entered into it on behalf of the United States and the District of Columbia with relatively little discussion and no apparent opposition. See 116 Cong. Rec. 13997–14000, 38840–38842 (1970). The legislation had been previously introduced in the 90th Congress at the request of the Attorney General; on that occasion, it had passed the House, but the Senate had failed to approve it. When it was introduced again in the 91st Congress, the need for the legislation was noted in both the House and Senate Reports:

> "The Attorney General has advised the committee that a prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing." H. R. Rep. No. 91–1018, p. 3 (1970); S. Rep. No. 91–1356, p. 3 (1970).

The Government now vigorously argues that when Congress enacted the Agreement into law, the United States became a

354

party to the Agreement only in its capacity as a "sending State." It contends that "Congress intended the United States to participate in the Agreement only for the purposes of allowing states more readily to obtain federal prisoners and allowing such prisoners to seek trial on outstanding detainers lodged against them with their federal custodian." Brief for United States in No. 77–52, p. 16. Thus, it argues, the Agreement has no relevance to the present cases, for here the Federal Government was the recipient of state prisoners. We have considered the grounds offered by the Government in support of this contention and conclude, as have all of the Courts of Appeals that have considered the question,[20] that the United States is a party to the Agreement as both a sending and a receiving State.

As even the Government concedes, the Agreement as enacted by Congress expressly includes the United States within the definition of "State"[21] and defines "Receiving State" as "the State in which trial is to be had on an indictment, information, or complaint pursuant to article III or article IV hereof." Art. II (c). The statute itself gives no indication that the United States is to be exempted from the category of receiving States. To the contrary, Art. VIII states that "[t]his agreement shall enter into *full* force and effect as to a party State when such State has enacted the same into law" (emphasis added).[22]

---

[20] In addition to the Court of Appeals for the Second Circuit, the following Courts of Appeals have rejected the Government's argument that it is only a sending State: the Third Circuit in *United States* v. *Sorrell*, 562 F. 2d, at 232 n. 7; the First Circuit in *United States* v. *Kenaan*, 557 F. 2d, at 915 n. 6; and the Fifth Circuit in *United States* v. *Scallion*, 548 F. 2d, at 1174.

[21] Under the Agreement "State" means "a State of the United States; the United States of America; a territory or possession of the United States; the District of Columbia; the Commonwealth of Puerto Rico." Art. II (a).

[22] Both Committee Reports made express reference to the fact that the

The brief legislative history that exists provides no further support for the Government's contention. It is true, as the Government points out, that most of the comment on the proposed legislation referred to problems encountered by States in obtaining federal prisoners, but there is no indication whatsoever that the United States' participation in the Agreement was to be a limited one. Senator Hruska, for example, spoke in favor of the Agreement on the floor of the Senate, saying:

> "By enactment of this bill the United States and the District of Columbia would become signatories to this agreement which has already been adopted by 28 States. By approving this measure today we can insure that the United States will become part of this vitally needed system of simplified and uniform rules for the disposition of pending criminal charges and the exchange of prisoners." 116 Cong. Rec. 38840 (1970).

Neither he nor anyone else in Congress drew a distinction between the extent of the United States' participation in the Agreement and that of the other member States, an observation that one would expect had the Federal Government entered into the Agreement as only a sending State.

Nor are we persuaded by the Government's argument that, because the United States already had an efficient means of obtaining prisoners—the writ of habeas corpus *ad prosequendum*—Congress could not have intended to join the United States as a receiving State. Although the United States perhaps did not gain as much from its entry into the Agreement as did some of the other member States,[23] the fact remains that

---

Agreement would enter into full force and effect upon passage. See H. R. Rep. No. 91–1018, p. 3 (1970); S. Rep. No. 91–1356, p. 3 (1970).

[23] Prior to the Agreement, there were several means by which States could obtain prisoners from other jurisdictions, none of which was entirely satisfactory. The traditional method was the use of formal extradition proceedings. This required a request for the prisoner by the

Congress did enact the Agreement into law in its entirety, and it placed no qualification upon the membership of the United States. The reference in the Committee Reports to the recommendation of the Attorney General, see *supra*, at 353, indicates that Congress was motivated, not only by the desire to aid States in obtaining federal prisoners, but also by the desire to alleviate the problems encountered by prisoners and prison systems as a result of the lodging of detainers. There is no reason to assume that Congress was any less concerned about the effects of federal detainers filed against state prisoners than it was about state detainers filed against federal prisoners. While the Government argues that a writ of habeas corpus *ad prosequendum* leads to none of the problems about which the drafters of the Agreement were concerned, we think that this argument is more properly addressed to the question whether such a writ constitutes a detainer for purposes of the Agreement, which we discuss below.[24]

---

Governor of the receiving State. It was sent to the Governor of the State that had custody of the prisoner, and he was permitted to investigate the situation to determine if the prisoner should be surrendered. If the Governor agreed to the extradition, he issued an arrest warrant against the prisoner, who was then permitted to challenge the legality of his arrest.

Rather than going through this formal procedure, some States entered into special contracts controlling the transfer of prisoners. The effort involved in arriving at such a contract, however, was often thought to outweigh the benefit of the simplified procedures unless there were frequent prisoner transfers between two States.

Because of problems with both of these methods, law enforcement authorities developed the informal practice of filing detainers against the prisoners; rather than seeking immediate transfer, the State would merely notify the State having custody of the prisoner that he was wanted at the completion of his sentence. This practice led to various problems, discussed in the text and n. 25, *infra*, that the Agreement sought to overcome. The Agreement also provided States with a simple and efficient means of obtaining prisoners from other States.

[24] The subsequent administrative and congressional actions cited by the Government do not convince us that the United States was meant to be

## IV

### A

United States district courts are authorized by 28 U. S. C. § 2241 (a) to grant writs of habeas corpus; expressly included within this authority is the power to issue such a writ when it is necessary to bring a prisoner into court to testify or for trial. § 2241 (c)(5). This Court has previously examined in great detail the history of the writ of habeas corpus *ad prosequendum,* observing that § 14 of the first Judiciary Act, 1 Stat. 81, authorized courts of the United States to issue writs of habeas corpus. *Carbo* v. *United States,* 364 U. S. 611, 614 (1961). Although § 14 did not expressly state that the courts could issue *ad prosequendum* writs, the Court in an opinion by Mr. Chief Justice Marshall, *Ex parte Bollman,* 4 Cranch 75 (1807), interpreted the words "habeas corpus" as being a generic term including the writ "necessary to remove a prisoner in order to prosecute him in the proper jurisdiction wherein the offense was committed." *Carbo, supra,* at 615 (emphasis omitted). Since the time of *Ex parte Bollman,*

---

only a sending State. Neither the Justice Department's opinion, then or now, that the United States is not a receiving State under the Agreement nor the statement of a subsequent Congress (in a draft Committee Report concerning a bill never enacted) that the Agreement did not limit the scope and applicability of the writ of habeas corpus *ad prosequendum* warrants our departing from the clear wording of the Agreement. Nor do we view the subsequently enacted Speedy Trial Act of 1974, 18 U. S. C. § 3161 *et seq.* (1976 ed.), as being inconsistent with the United States' status as a receiving State. In situations in which two different sets of time limitations are prescribed, the more stringent limitation may simply be applied. Finally, we deem it irrelevant that bills currently pending in Congress, S. 1437, 95th Cong., 1st Sess., § 3201 (1977); H. R. 6869, 95th Cong., 1st Sess., § 3201 (1977), would limit the United States' participation as a receiving State to proceedings under only Art. III of the Agreement. That action demonstrates a view contrary to the Government's position that the United States should be a receiving State for no purposes; furthermore, it may be read as confirming the conclusion that the United States is currently a receiving State for all purposes.

the statutory authority of federal courts to issue writs of habeas corpus *ad prosequendum* to secure the presence, for purposes of trial, of defendants in federal criminal cases, including defendants then in state custody, has never been doubted. In 1948 this authority was made explicit with the enactment of 28 U. S. C. § 2241, and in 1961 the Court held that this authority was not limited by the territorial boundaries of the federal district court. *Carbo, supra.* The role and functioning of the *ad prosequendum* writ are rooted in history, and they bear little resemblance to the typical detainer which activates the provisions of the Agreement.

Unlike a writ of habeas corpus *ad prosequendum* issued by a federal district court, a detainer may be lodged against a prisoner on the initiative of a prosecutor or law enforcement officer.[25] Rather than requiring the immediate presence of the prisoner, a detainer merely puts the officials of the institution in which the prisoner is incarcerated on notice that the prisoner is wanted in another jurisdiction for trial upon his release from prison. Further action must be taken by the receiving State in order to obtain the prisoner. Before it was made clear that a prosecuting authority is not relieved of its obligation to provide a defendant a speedy trial just because he is in custody elsewhere, see *Smith* v. *Hooey,* 393 U. S. 374

---

[25] Problems possibly resulting from this lack of judicial supervision have been described by the Court of Appeals for the Fourth Circuit:

"Detainers, informal aides [*sic*] in interstate and intrastate criminal administration, often produce serious adverse side-effects. The very informality is one source of the difficulty. Requests to an imprisoning jurisdiction to detain a person upon his release so that another jurisdiction may prosecute or incarcerate him may be filed groundlessly, or even in bad faith, as suspected by the appellant in this case. The accusation in a detainer need not be proved; no judicial officer is involved in issuing a detainer. As often happens, the result of the then unestablished charge upon which the detainer in this case rested was that the detainee was seriously hampered in his quest for a parole or commutation." *Pitts* v. *North Carolina,* 395 F. 2d 182, 187 (1968) (footnote omitted).

(1969), detainers were allowed to remain lodged against prisoners for lengthy periods of time, quite often for the duration of a prisoner's sentence.

B

The Agreement itself contains no definition of the word "detainer." The House and Senate Reports, however, explain that "[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." H. R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970). While the Court of Appeals for the Second Circuit concluded that this definition is broad enough to include within its scope a federal writ of habeas corpus *ad prosequendum,* the concerns expressed by the drafters of the Agreement and by the Congress that enacted it demonstrate that the word "detainer" was not so intended.

In recommending the adoption of the Agreement, the Council of State Governments outlined some of the problems caused by detainers that the Agreement was designed to address. It noted that prison administrators were "thwarted in [their] effort[s] toward rehabilitation [because t]he inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program." Council of State Governments, Suggested State Legislation Program for 1957, p. 74 (1956). Furthermore, the prisoner was often deprived of the ability to take advantage of many of the prison's programs aimed at rehabilitation, merely because there was a detainer lodged against him. This problem was noted by the Director of the Federal Bureau of Prisons, who in 1959 stated that he "remember[ed] the day when the presence of a detainer automatically guaranteed that the inmate would be held in close custody and denied training and work experiences in more relaxed situations, such as the farm, which frequently represent a valuable resource in treating prisoners and testing their progress." Bennett, The Last

Full Ounce, 23 Fed. Prob. 20, 21 (June 1959). The Council of State Governments also pointed out that the existence of detainers presented problems in sentencing; when detainers had previously been filed against the defendant, the sentencing judge would hesitate to give as long a sentence as he thought might otherwise be indicated, there being a possibility that the defendant would be required to serve subsequent sentences. The Council stated that "proper sentencing, as well as proper correctional treatment, is not possible until the detainer system is modified." Council of State Governments, *supra,* at 74. Similar concerns were expressed by the Attorney General in his recommendation to Congress. See *supra,* at 353.

The adverse effects of detainers that prompted the drafting and enactment of the Agreement are thus for the most part the consequence of the lengthy duration of detainers. Because a detainer remains lodged against a prisoner without any action being taken on it, he is denied certain privileges within the prison, and rehabilitation efforts may be frustrated. For these reasons the stated purpose of the Agreement is "to encourage the *expeditious* and orderly disposition of [outstanding] charges and determination of the proper status of any and all detainers based on untried indictments, informations, or complaints." Art. I (emphasis added).

Because writs of habeas corpus *ad prosequendum* issued by a federal court pursuant to the express authority of a federal statute are immediately executed, enactment of the Agreement was not necessary to achieve their expeditious disposition. Furthermore, as noted above, the issuance of *ad prosequendum* writs by federal courts has a long history, dating back to the first Judiciary Act. We can therefore assume that Congress was well aware of the use of such writs by the Federal Government to obtain state prisoners and that when it used the word "detainer," it meant something quite different from a writ of habeas corpus *ad prosequendum.* Contrary

to the contention of the Court of Appeals in No. 76–1596, it is not necessary to construe "detainer" as including these writs in order to keep the United States from evading its duties under the Agreement. When the United States obtains state prisoners by means of a writ of habeas corpus *ad prosequendum*, the problems that the Agreement seeks to eliminate do not arise;[26] accordingly, the Government is in no sense circumventing the Agreement by means of the writ. We therefore conclude that a writ of habeas corpus *ad prosequendum* is not a detainer for purposes of the Agreement.

Because in No. 76–1596 the Government never filed a detainer against Mauro and Fusco, the Agreement never became applicable and the United States was never bound by its provisions. The Court of Appeals therefore erred in affirming the dismissal of the indictments against the respondents.

## V

Our analysis of the purposes of the Agreement and the reasons for its adoption by Congress leads us to reject the Government's argument in No. 77–52 that a writ of habeas corpus *ad prosequendum* may not be considered a "written request for temporary custody" within the meaning of Art. IV of the Agreement. Once the Federal Government lodges a detainer

---

[26] The Court of Appeals concluded that Art. IV's requirement that the prisoner be tried before he is returned to the sending State demonstrates a concern of the Agreement that prisoners not be shuttled back and forth between penal institutions. This problem, the court noted, is one that arises from the use of writs of habeas corpus *ad prosequendum* as well as from detainers. We agree with Judge Mansfield, however, that the real concern of this provision was that, if the prisoner were returned to the sending State prior to the disposition of the charges in the receiving State, the detainer previously lodged against him would remain in effect with all its attendant problems. These problems, of course, would not arise if a detainer had never been lodged and the writ alone had been used to remove the prisoner, for the writ would have run its course and would no longer be operative upon the prisoner's return to state custody.

against a prisoner with state prison officials, the Agreement by its express terms becomes applicable and the United States must comply with its provisions. And once a detainer has been lodged, the United States has precipitated the very problems with which the Agreement is concerned. Because at that point the policies underlying the Agreement are fully implicated, we see no reason to give an unduly restrictive meaning to the term "written request for temporary custody." It matters not whether the Government presents the prison authorities in the sending State with a piece of paper labeled "request for temporary custody" or with a writ of habeas corpus *ad prosequendum* demanding the prisoner's presence in federal court on a certain day; in either case the United States is able to obtain temporary custody of the prisoner. Because the detainer remains lodged against the prisoner until the underlying charges are finally resolved, the Agreement requires that the disposition be speedy and that it be obtained before the prisoner is returned to the sending State. The fact that the prisoner is brought before the district court by means of a writ of habeas corpus *ad prosequendum* in no way reduces the need for this prompt disposition of the charges underlying the detainer. In this situation it clearly would permit the United States to circumvent its obligations under the Agreement to hold that an *ad prosequendum* writ may not be considered a written request for temporary custody.[27]

The Government points to two provisions of the Agreement

---

[27] The Government admits that a similar provision of the Speedy Trial Act referring to "a properly supported request for temporary custody of such prisoner for trial," 18 U. S. C. § 3161 (j) (4) (1976 ed.), is properly interpreted as including an *ad prosequendum* writ. Brief for United States in No. 77–52, p. 48 n. 35. The difference, it says, is that the legislative history of the Speedy Trial Act shows that its provisions are to have broad applicability. This argument overlooks the fact that the Agreement, on its face, contains a similar expression of intent. Article IX states that "[t]his agreement shall be liberally construed so as to effectuate its purposes."

which it contends demonstrate that "written request" was not meant to include *ad prosequendum* writs; neither argument is persuasive. First the Government notes that under Art. IV (a) there is to be a 30-day waiting period after the request is presented during which the Governor of the sending State may disapprove the receiving State's request. Because a writ of habeas corpus *ad prosequendum* is a federal-court order, it would be contrary to the Supremacy Clause, the United States argues, to permit a State to refuse to obey it. We are unimpressed. The proviso of Art. IV (a) does not purport to augment the State's authority to dishonor such a writ. As the history of the provision makes clear, it was meant to do no more than preserve previously existing rights of the sending States, not to expand them.[28] If a State has never had authority to dishonor an *ad prosequendum* writ issued by a federal court, then this provision could not be read as providing such authority. Accordingly, we do not view the provision as being inconsistent with the inclusion of writs of habeas corpus *ad prosequendum* within the meaning of "written requests."

The Government also points out that the speedy trial requirement of Art. IV (c) by its terms applies only to a "proceeding made possible by this article . . . ." When a prisoner is brought before a district court by means of an *ad prosequendum* writ, the Government argues, the subsequent proceedings are not *made possible* by Art. IV because the United States was able to obtain prisoners in that manner long before it entered into the Agreement. We do not accept the Gov-

---

[28] Both Committee Reports note that "a Governor's right to refuse to make a prisoner available is *preserved* . . . ." H. R. Rep. No. 91–1018, p. 2 (1970) (emphasis added); S. Rep No. 91–1356, p. 2 (1970) (emphasis added). The Council of State Governments discussed the provision in similar terms: "[A] Governor's right to refuse to make the prisoner available (on public policy grounds) is *retained.*" Council of State Governments, Suggested State Legislation Program for 1957, p. 78 (1956) (emphasis added).

ernment's narrow reading of this provision; rather we view Art. IV (c) as requiring commencement of trial within 120 days whenever the receiving State initiates the disposition of charges underlying a detainer it has previously lodged against a state prisoner. Any other reading of this section would allow the Government to gain the advantages of lodging a detainer against a prisoner [29] without assuming the responsibilities that the Agreement intended to arise from such an action.[30]

Finally, we agree with the Court of Appeals in No. 77–52 that respondent Ford's failure to invoke the Agreement in specific terms in his speedy trial motions before the District Court did not result in a waiver of his claim that the Government violated Art. IV (c). The record shows that from the time he was arrested Ford persistently requested that he

---

[29] The Government made it quite clear during oral argument that, despite the availability of writs of habeas corpus *ad prosequendum,* the United States makes great use of detainers and considers them to play an important function. See Tr. of Oral Arg. in No. 76–1596, p. 37. They serve to put the state prison officials on notice that the Federal Government has charges pending against a prisoner, even though his immediate prosecution may not be contemplated, and that he should not be released without the Government's being notified. We were informed that during a typical year federal courts issue approximately 5,000 *ad prosequendum* writs and that about 3,000 of those are in cases in which a detainer has previously been lodged against the prisoner. Tr. of Oral Arg. in No. 77–52, p. 13.

[30] In arguing that Congress did not intend the word "request" to encompass writs of habeas corpus *ad prosequendum,* the dissent refers to legislative history indicating that the Agreement was not meant to be the exclusive means of effecting a transfer of a prisoner for purposes of prosecution. Nothing we have said today, however, is contrary to this intent. As our judgment in No. 76–1596 indicates, the Government need not proceed by way of the Agreement. It may obtain a state prisoner by means of an *ad prosequendum* writ without ever filing a detainer; in such a case, the Agreement is inapplicable. It is only when the Government does file a detainer that it becomes bound by the Agreement's provisions.

be given a speedy trial. After his trial date had been continued for the third time, he sought the dismissal of his indictment on the ground that the delay in bringing him to trial while the detainer remained lodged against him was causing him to be denied certain privileges at the state prison. We deem these actions on Ford's part sufficient to put the Government and the District Court on notice of the substance of his claim.

The United States does not challenge the conclusion of the Court of Appeals that, if Art. IV (c) was applicable, it was violated by the extensive delay in bringing Ford to trial. Accordingly, we conclude that the Court of Appeals correctly reversed the judgment of the District Court and ordered that the indictment against Ford be dismissed.

The judgment of the Court of Appeals in No. 76–1596 is reversed, and the case is remanded for further proceedings consistent with this opinion. In No. 77–52, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

MR. JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE joins, concurring in the judgment in No. 76–1596 and dissenting in No. 77–52.

I agree with the Court's conclusion in No. 76–1596 that a writ of habeas corpus *ad prosequendum* is not a detainer within the meaning of the Interstate Agreement on Detainers. As the Court observes, *ante,* at 360: "[T]he issuance of *ad prosequendum* writs by federal courts has a long history, dating back to the first Judiciary Act. We can therefore assume that Congress was well aware of the use of such writs by the Federal Government to obtain state prisoners and that when it used the word 'detainer,' it meant something quite different from a writ of habeas corpus *ad prosequendum.*" Indeed, there is simply nothing in the language or legislative history of the Agreement to indicate that Congress intended to cut

back in any way on the scope and use of the writ. But for these very reasons I cannot agree with the result in No. 77–52.

I am first struck by the Court's interesting approach to statutory construction, the significance of which cannot be lost on even the most casual reader. The Court considers *ad prosequendum* writs to be "written requests for temporary custody" not because the language of the Agreement compels, or indeed even supports, that result, but rather because the "purposes of the Agreement and the reasons for its adoption by Congress" supposedly lead to that result. *Ante,* at 361. One certainly may find it necessary to resort to interpretative aids other than the language of the statute when difficult questions of construction arise. I would have thought, however, that one would *first* turn to the language of the statute before resorting to such extra-statutory interpretative aids. See *United States* v. *Kahn,* 415 U. S. 143, 151 (1974).

The reason, indeed the necessity, for the Court's pursuing the opposite course in this case is readily apparent, however. The language of the Agreement simply does not support the Court's conclusion. The Agreement speaks only of "requests" for custody. In the writ in the instant case, on the other hand, the warden of the Massachusetts Correctional Institution at Walpole was "HEREBY COMMANDED to have the body of RICHARD THOMSON FORD . . . before the Judges of our District Court" on a date certain. App. in No. 77–52, p. 8. The Massachusetts warden would no doubt be surprised to hear that the United States had only "requested" the custody of his prisoner.

But even if the language of the Agreement were broad enough to encompass a writ of habeas corpus, it seems to me that for the same reasons the Court does not consider a writ to be a "detainer" it cannot view a writ as a request. The writ has a long history, of which Congress must have been aware when it enacted the Agreement. It is inconceivable to me that Congress intended to include the writ in the opera-

tion of the Agreement, and thereby make new and different conditions flow from its use, simply by use of the phrase "written request for temporary custody." In fact, the intimations in the legislative history are to the contrary. The Reports of both the House and Senate Judiciary Committees suggest that Congress did not intend the procedures established by the Agreement to be the exclusive means of effecting a transfer of a prisoner for purposes of prosecution.

> "The agreement also provides *a* method whereby prosecuting authorities may secure prisoners serving sentences in other jurisdictions for trial before the expiration of their sentences and before the passage of time has dulled the memory or made witnesses unavailable." H. R. Rep. No. 91–1018, p. 2 (1970); S. Rep. No. 91–1356, p. 2 (1970). (Emphasis added.)

A draft of the Senate Judiciary Committee Report on S. 1 in 1975 also leaves no doubt that many of the Congressmen directly involved in the passage of the Agreement did not think they were in any way limiting the scope or application of the writ. The Report states:

> "Federal prosecution authorities and all Federal defendants have always had and continue to have recourse to a speedy trial in a Federal court pursuant to 28 U. S. C. § 2241 (c)(5), the Federal writ of *habeas corpus ad prosequendum.* The Committee does not intend, nor does it believe that the Congress in enacting the Agreement in 1970 intended, to limit the scope and applicability of that writ." S. Rep. No. 94–00, p. 984 (1975).*

---

*This Report is, of course, not overwhelmingly persuasive, given that it postdates the enactment of the Agreement and concerns a measure which was not even enacted into law at that time. Such so-called "subsequent legislative history" cannot "serve to change the legislative intent of Congress expressed before the Act's passage." *Regional Rail Reorganization Act Cases,* 419 U. S. 102, 132 (1974). It does, however, represent the

I likewise find myself at a loss to discover exactly what problems the United States has "precipitated" by lodging a detainer against a prisoner and then securing his custody by use of the writ or how this process allows the Government "to circumvent its obligations under the Agreement . . . ." *Ante,* at 362. The Court correctly recognizes that the primary purpose of the Agreement was to provide a solution to the problems encountered by prisoners and prison systems as a result of the lodging of detainers. *Ante,* at 356, 359–360. Upon the mere filing of a detainer by the United States, however, the prisoner clearly has the right under the Agreement to request speedy disposition of the underlying charges if he so desires. *Ante,* at 351. The Government in no way excuses itself from this obligation by later using a writ of habeas corpus to secure the prisoner's custody. But by the same token, when the Government chooses *not* to take advantage of the remaining procedures specified in the Agreement after it files a detainer, I see nothing in the Agreement to suggest that the Government is still bound by all of the conditions which attach when it does choose to take full advantage of those procedures. Neither do I see anything in this procedure which precipitates any of the problems the Agreement was intended to alleviate. And to the extent any of the concerns expressed by the Court relate to the possibility of pretrial delay, the Speedy Trial Act of 1974, 18 U. S. C. § 1361 *et seq.* (1976 ed.), which creates specific time limits within which all federal defendants must be tried, must lessen if not totally dissipate those concerns.

Neither can I shrug off as cavalierly as the Court the Government's arguments with respect to other related language of the Agreement. The Government argues that since

personal views of these legislators, *ibid.,* and thus is not totally without significance, given that 12 of the 15 members of the Committee who issued the draft Report had been members of the same Committee which issued the original Report recommending adoption of the Agreement.

Art. IV (a) gives the Governor of a sending State the opportunity to disapprove the receiving State's "request," the term "request" cannot include the writ of habeas corpus, with which a State clearly has no right to refuse to comply. The Court responds that this provision was meant to do no more than preserve existing rights, and if the States did not previously have the right to refuse writs, then this provision cannot be read as providing such authority. *Ante*, at 363. But that is no response at all. The Court is simply picking and choosing which provisions it will apply to the United States and which it will not, in order to consistently construe a statutory scheme which has been made facially inconsistent by the Court's wrong turn at the outset. I see no justification, and, perhaps more importantly, no standards, for engaging in this sort of gerrymandering of a statute. Rather, if, as the Court admits, this statutory provision was intended only to "preserve" a Governor's right to refuse a "request," then the only logical and consistent inference therefrom is that the term "request" does not include writs of habeas corpus, which cannot be refused.

The Government also argues that the speedy trial provision of Art. IV (c) applies only to "proceeding[s] made possible by this article . . . ." Since proceedings against a prisoner whose presence has been secured by an *ad prosequendum* writ are not "made possible" by Art. IV, the speedy trial provision contained therein must not be applicable in this case. The Court's response to this argument is even less persuasive. It primly refuses to "accept the Government's narrow reading of this provision," *ante*, at 363–364, but ventures no alternative reading, narrow or broad, which is a defensible alternative to that offered by the Government.

Finally, the Court admits that the Agreement was introduced into Congress by, and, one can fairly surmise given the paucity of legislative history, enacted into law largely at the behest of, the Department of Justice, which unequivocally en-

dorsed the legislation. S. Rep. No. 91–1356, *supra,* at 1, 5–6; H. R. Rep. No. 91–1018, *supra,* at 1, 5–6. Thereafter, the Department has consistently taken the position through its actions, though perhaps not its words, that writs of habeas corpus do not fall within the terms of the Agreement. This administrative construction certainly may be entitled to less weight than if it had been accompanied by a contemporaneous, well-reasoned explanation. But I would have thought, at least until today, that it was entitled to *some* weight, particularly in a case such as this where the language of the statute is not entirely clear on its face or, to the extent it is, supports, rather than undermines, the administrative construction. Cf. *United States* v. *Correll,* 389 U. S. 299, 304 (1967).

In sum, I am left with the distinct impression that the Court is stretching to reach the result it considers most desirable from a policy standpoint. Since I see little in the normal tools of statutory construction to justify the interpretation adopted by the Court today, and much in them to condemn it, I dissent from the Court's disposition of No. 77–52.