**PEOPLE of the State of Colorado, Plaintiff-Appellant,**

v.

**Seth YELLEN, Defendant-Appellee.**

**No. 84SA42.**

Supreme Court of Colorado, En Banc.

June 24, 1985.

Rehearing Denied Aug. 19, 1985.

Norman S. Early, Jr., Dist. Atty., O. Otto Moore, Asst. Dist. Atty., Brooke Wunnicke, Chief Appellate Deputy Dist. Atty., Denver, for plaintiff-appellant.

Robert C. Tobias, Denver, for defendant-appellee.

ROVIRA, Justice.

The People appeal an order of the Denver District Court dismissing an information charging the defendant, Seth Allen Yellen, with one count of aggravated robbery and a count of mandatory sentence—violent crime. The district court held that the defendant's rights under the Uniform Mandatory Disposition of Detainers Act (the Act), sections 16–14–101 to –108, 8 C.R.S. (1978), had been violated because the defendant, a prisoner, had not been "promptly informed" of the pending charges against him and of his right to request a final disposition of the pending charges. It also held that section 16–14–102(3) is unconstitutional because it is inconsistent with section 16–14–102(2), and because it violates the defendant's right to equal protection. We hold that although the superintendent was aware of pending charges against the defendant, such knowledge did not constitute a detainer, and therefore the superintendent's duty to promptly inform the defendant of his rights under the Act did not arise. Accordingly, we reverse and remand the case to the district court with instructions to reinstate the charges.

I.

The defendant was arrested in connection with the present case on June 9, 1981. On July 15, 1981, an information was filed in the Denver District Court which charged him with one count of aggravated robbery, and with an additional count of mandatory sentence—violent crime. The defendant pleaded not guilty on July 31, 1981, and trial was set for November 2, 1981.

The defendant requested a continuance of his trial on October 23, 1981, and waived his right to a speedy trial through April 23, 1982. The trial court continued the case for trial to February 3, 1982. On that date, pursuant to the defendant's request for a continuance, the case was continued to April 12, 1982, and he was granted leave to apply for a Pre-Plea Report. On the application for a Pre-Plea Report, there was a notation that Arapahoe County was also investigating the defendant, and a request that the Pre-Plea Report supplement the information received from the Arapahoe County Probation Department.

On April 5, 1982, a Denver Probation Department Officer completed an Information Sheet stating that the Presentence Investigation Report of the Arapahoe County Probation Department could not be completed because Arapahoe County could not locate the defendant for an interview. The defendant failed to appear in court on April 12, and the Denver District Court issued an Alias Capias.

The defendant was brought into court for a return on Alias Capias hearing on August 31, 1982. The case was continued to October 28, 1982, for disposition, the court noting that the defendant was scheduled to be sentenced in an unrelated Arapahoe County case on October 24.[1]

On October 28, 1982, the defendant requested yet another continuance in order to consider applying for a Writ of Habeas Corpus in Arapahoe County. The case was

---

1. On October 26, 1982, the Pre-Plea Report was prepared. Incorporated in this report is the Presentence Report which was prepared for the Arapahoe County case. The Pre-Plea Report demonstrates that the defendant had been con-

victed of six felonies: Larceny; Attempted Uttering and Publishing a Forged Check; Concealing a Crime for Consideration; Forgery and Uttering and Publishing; Delivery of Heroin; and Aggravated Robbery.

continued to November 16, 1982, for consideration of the Pre-Plea Report. On that date, the defendant again waived his right to a speedy trial through May 15, 1983.

The defendant entered the Colorado State Penitentiary at Canon City on December 6, 1982, to serve his Arapahoe County sentence.

On January 11, 1983, the defendant was in his counselor's office at the Department of Corrections when he overheard a telephone conversation between the counselor and the Denver District Court in which the counselor was inquiring whether there were any outstanding cases in Denver against the defendant.

Ten days later, the defendant was given a document entitled "Department of Corrections Classification Review" which included the following paragraph under "Comments":

> Seth was received at SMCF from the Diagnostic Unit on 1/17/83. He is serving eight years for Aggravated Robbery. He has a Detainer for Aggravated Murder and Attempted Murder from Ohio. He has Pending Charges from Denver, Pending Charges of Homicide and Aggravated Robbery in Ohio, and Pending Charges in Michigan. Seth has been assigned to the Work Labor Program.

The defendant, appearing by his attorney on February 15, 1983, requested another continuance, and the case was continued until March 14, 1983. He signed a Waiver of Speedy Trial form on February 28, thereby waiving his right to a speedy trial until August 27, 1983. The waiver was filed with the court on March 14, 1983.

Yellen was released into the custody of the State of Michigan on May 19, 1983, pursuant to a disposition of detainer request.

On August 9, 1983, the defense attorney, on the defendant's behalf, again waived the right to speedy trial through February 8, 1984. The waiver was executed pursuant to the defendant's own request for a speedy determination of the Michigan matter. While the defendant was in Michigan, a detainer issued by the Denver District Court was lodged at the Department of Corrections on August 19, 1983.

The defendant was returned to Colorado from Michigan on December 17, 1983, and, on the 19th, he was advised of his rights under the Act.

On December 28, 1983, the defendant filed a *pro se* motion to dismiss on the grounds that the superintendent had failed to "promptly inform" him of his rights as required by the Act. He claimed that the superintendent had knowledge of the charges pending in Denver on or before January 21, 1983, and that the failure to inform him of his rights in the 108 days between that date and the date he left the jurisdiction pursuant to the Michigan detainer was not "prompt" within the meaning of the Act.

A hearing was held on the defendant's motion and the motion was granted. The trial court held that the defendant was not "promptly" informed of his rights as required by section 16–14–102(2). It further held that section 16–14–102(3) was unconstitutional on two grounds: (1) sections 16–14–102(2) and 16–14–102(3) were inconsistent and such inconsistency must be reconciled in favor of the accused; and (2) section 16–14–102(3) denied the defendant equal protection because there is no similar provision in the Interstate Agreement on Detainers Act, 18 U.S.C.App. §§ 1–8(1982).

## II.

■ We must determine whether or not the superintendent's duty to promptly inform the defendant of his rights under the Act was initiated when the superintendent became aware of pending charges against Yellen. Section 16–14–102(2), 8 C.R.S. (1978) provides:

> It is the duty of the superintendent of the institution where the prisoner is confined to promptly inform each prisoner, in writing, of the source and nature of any untried indictment, information, or criminal complaint against him of which the superintendent has knowledge, and

of the prisoner's right to make a request for final disposition thereof.

Although the statute imposes a duty to promptly inform the inmate of his rights, this duty only arises when the superintendent of the institution has "knowledge" of the untried indictment, information, or criminal complaint. To determine whether the duty arose in the present case, it is essential to determine the meaning of the term "knowledge" as used in the Act.

The district court equated "knowledge" of an untried charge with awareness that a charge was pending. Due to the comments on the defendant's Classification Review, it is clear that on or before January 21, 1983, the superintendent was aware of pending charges in Denver. However, the People contend that awareness of pending charges is not the equivalent of "knowledge" of pending charges within the meaning of section 16–14–102(2), and that the superintendent does not have "knowledge" of an untried charge until a detainer is filed. Thus, they contend that the superintendent's duty to promptly inform the defendant of his rights does not arise until a detainer has been filed. We agree.

■ The meaning of a term in a statute must be discerned by reading the entire statute. *People ex rel. Dunbar v. Trinidad State Jr. College*, 184 Colo. 305, 520 P.2d 736 (1974). Application of this rule of statutory construction leads us to conclude that the information on the Classification Review was not knowledge within the meaning of the Act and that the superintendent only has "knowledge" of untried charges when a detainer has been filed.

■ Section 16–14–102(2) requires the superintendent to promptly inform the prisoner of "the source and nature" of pending

charges. Mere awareness of pending charges does not supply the superintendent with sufficient information to fulfill this duty,[2] and we do not infer any duty on the superintendent to investigate pending charges in order to acquire this information.

Section 16–14–102(3), 8 C.R.S. (1978), provides:

> Failure of the superintendent of the institution where the prisoner is confined to inform a prisoner, as required by subsection (2) of this section, within one year after a detainer from this state has been filed with the institution where the prisoner is confined shall entitle the prisoner to a dismissal with prejudice of the indictment, information, or criminal complaint.

Thus, subsection (3), which expressly refers to subsection (2), makes it clear that the superintendent has "knowledge" of an untried indictment, information, or criminal complaint on the date a "detainer" is filed.

Not only does subsection (3) clearly indicate that the superintendent's duties in subsection (2) are dependent upon the filing of a detainer, but a review of the Interstate Agreement on Detainers Act (the IAD), section 24–60–501, 10 C.R.S. (1982), also indicates this. Article III(c) of the IAD, which is analogous to section 16–14–102(2) of the Act, states:

> The warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information, or complaint on which the detainer is based.

---

**2.** The defendant admitted in his *pro se* argument to the district court that the Classification Review did not disclose the source and nature of the pending charges. However, even though the facts in the Classification Review are insufficient to establish that the superintendent had knowledge of the "source and nature" of the Denver charges, it is clear beyond question that when the defendant entered the Colorado penitentiary on December 6, 1982, he knew of the "source and nature" of the untried information pending against him in the Denver District Court. By the time he entered the penitentiary, he had appeared in the Denver District Court six times and had waived his right to a speedy trial twice. Furthermore, after entering the penitentiary, and after receiving the Classification Review, he again signed a written waiver of his right to a speedy trial.

■ Thus, the IAD expressly conditions the duty to promptly inform upon the filing of a detainer. *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (the provisions of the IAD are triggered only when a "detainer" is filed).

■ The IAD and the Act were enacted on the same day. Ch. 111, sec. 8, 9, 1969 Colo.Sess.Laws 291–92. The policy concerns underlying the IAD can be applied to the Act. *People v. Swazo*, 199 Colo. 486, 489, 610 P.2d 1072, 1074 (1980). It would be irrational to conclude that awareness of pending charges initiates the duty to inform under the Act when only the filing of a detainer triggers the duty under the IAD. Therefore, we must conclude that the legislature intended the same action, the filing of a detainer, to initiate the duty to inform under both statutes.[3]

Furthermore, the comments made by the Council of State Governments, which included the proposed Uniform Mandatory Disposition on Detainers in its Suggested State Legislation Program for 1959, demonstrates that the filing of a detainer is necessary to trigger the Act:

> The basic purpose of the act is to afford a means of permitting a prisoner to clear up *detainers* which have been lodged against him. It provides that a prisoner, wishing to clear a detainer based on an outstanding indictment, information or complaint, may make a request for final disposition of the charges against him.

Suggested State Legislation for 1959, p. 167 (emphasis added).

■ A detainer is " 'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction.' " *People v. Moody*, 676 P.2d 691, 693 n. 2 (Colo.1984), *quoting United States v. Mauro*, 436 U.S. 340, 359, 98 S.Ct. 1834, 1846, 56 L.Ed.2d 329 (1978). The Council of State Governments defined

a detainer as "a warrant filed against a person already in custody with the purpose of insuring that he will be available to the authority which has placed the detainer." Suggested State Legislation for 1959, p. 167. In the present case, the superintendent was aware of charges pending against the defendant when his classification review was given; however, no "warrant" or "notification" was filed with the institution until August 19, 1983. Awareness of pending charges, unlike a detainer, would not insure that the prisoner would be available to the authorities where the charges were pending. Clearly awareness of pending charges in another jurisdiction is not the equivalent of having an actual detainer filed from that jurisdiction. *See United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978) (a writ of habeas corpus *ad prosequendum* is not a detainer within the meaning of the IAD and does not trigger its application). Only the filing of a detainer triggers the superintendent's duty to promptly inform the defendant of his rights under the Act. *See State v. Carlson*, 258 N.W.2d 253 (N.D. 1977) (Uniform Mandatory Disposition of Detainers Act applies only in those instances where a detainer has been filed).

Not only does the notation on the Classification Review fail to come within the formal definition of the term "detainer," but it also fails to provide a basis for triggering the duty to inform in light of one of the purposes behind the Act. In *United States v. Ford*, 550 F.2d 732, 737–39 (2d Cir.1977), *aff'd sub nom., United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978), the Second Circuit discussed the policy concerns of the drafters of the IAD:[4]

> Prison authorities often accorded detainers considerable weight in making decisions with respect to the terms and conditions of the prisoner's incarceration and release on parole. Sometimes the prison-

---

**3.** The defendant also admitted in his argument to the district court that the IAD and the Act are to be interpreted as providing the same rights and duties unless there is a conflict between the statutes.

**4.** As previously noted, the policy concerns underlying the IAD can be applied to the Act.

er would automatically be held under maximum security. Sometimes he would be ineligible for special work programs, athletic programs, release for visits to relatives' death beds or funerals, or special minimum security facilities. Often detainers precluded the granting of parole. Despite these serious consequences, virtually any law enforcement officer—prosecutor, policeman, or judge—could file a detainer without any procedural prerequisites. No pending indictment or other formal notification of charges was generally required. Indeed, it was estimated that as many as 50% of all detainers were allowed to lapse on the prisoner's release, without any attempts at prosecution by the jurisdiction that had filed the detainer. There were even cases in which the only reason the detainer had been filed was to increase the severity of the prisoner's sentence. Thus detainers imposed major unjustifiable hardships on prisoners, and, prior to adoption of the Agreement on Detainers, there was nothing a prisoner could do about them. (footnotes omitted).

Although prison authorities may have accorded detainers considerable weight in making decisions with respect to the terms and conditions of the prisoner's incarceration, there is no indication that such consideration is given to pending charges in which no detainer has been filed. In fact, it is clear that the pending charges did not render the defendant ineligible for special work programs since the Classification Review states that he was assigned to the Work Labor Program. Since mere awareness of pending charges, unlike a detainer, apparently does not affect the terms and conditions of the prisoner's incarceration, this policy concern underlying the Act does not require the superintendent to promptly inform a prisoner when the superintendent has only general information concerning pending charges.

Mere awareness that charges are pending against an inmate in another jurisdiction does not trigger the superintendent's duty to inform the defendant of his rights under the Act.[5] Only the filing of a detainer triggers the superintendent's duty under section 16–14–102.

The judgment is reversed, and the case is remanded with instructions to reinstate the information.

5. Since we find that the Correction Review did not give rise to the superintendent's duty to promptly inform the defendant, we need not address whether section 16–14–102(3) is unconstitutional. Thus, we vacate the district court's holding on this issue and express no opinion as to the constitutionality of that section.