## PEOPLE v COOK

Docket No. 77-3098. Submitted January 2, 1980, at Lansing.—Decided
March 4, 1980. Leave to appeal applied for.

Ronnie D. Cook was convicted of two counts of obtaining money
by false pretenses and two counts of possession of a stolen
vehicle with intent to pass title thereto, Recorder's Court of
Detroit, Patricia J. Boyle, J. Before being charged in Michigan,
Cook had been serving a sentence in a Federal penitentiary in
Illinois. His presence in Michigan was obtained pursuant to a
writ of habeas corpus ad prosequendum. After arraignment and
before trial several adjournments were granted, and at one
point the defendant was transferred back to the Federal facility
and then to a Federal Community Treatment Center where he
spent some three months before again being transferred to the
Wayne County Jail. Defendant appeals, alleging that the Inter-
state Agreement on Detainers was violated when he was re-
turned to Federal authorities prior to the trial, that the Inter-
state Agreement on Detainers was violated because he was not
brought to trial within 120 days of his first arrival in Michigan,
that evidence of similar bad acts of the defendant introduced at
trial was insufficient to establish that he actually committed
those acts, and that certain documents were erroneously admit-
ted into evidence. *Held:*

1. The provision of the Interstate Agreement on Detainers
which requires charges against a defendant to be dismissed if
he is returned to the original place of imprisonment without
trial being had was not violated by the defendant's return to
Federal authorities. The return was at the defendant's own
request and made possible the continuation of a rehabilitation

REFERENCES FOR POINTS IN HEADNOTES

[1] 31 Am Jur 2d, Extradition § 71.

Validity, construction, and application of Interstate Agreement on
Detainers. 98 ALR3d 160.

[2] 31 Am Jur 2d, Extradition § 25.

[3, 4] 29 Am Jur 2d, Evidence § 333.

[5, 6] 30 Am Jur 2d, Evidence § 1011 *et seq.*

Admissibility in evidence of enlarged photographs or photostatic
copies. 72 ALR2d 308.

program, which was in furtherance of the goal of the provision in question, that being to avoid the disruptive effect on rehabilitative programs caused by the shuttling of prisoners between jurisdictions.

2. The requirement that a defendant who is sent from one state to another be brought to trial within 120 days is subject to certain limitations. In this case much of the delay in bringing the defendant to trial was requested or initiated by the defendant and is therefore not included when calculating the 120-day period. There was no violation of the 120-day requirement.

3. There was sufficient competent evidence presented to establish that the defendant did in fact commit the prior similar bad acts which the prosecutor sought to prove.

4. Photocopies and microfilm copies of automobile title documents were admissible into evidence even though the copies were not stamped certified as correct, because such copies are admissible as exceptions to the best evidence rule and in this case the actual custodian of the documents testified as to their authenticity.

Affirmed.

1. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — RE-
   TURN OF PRISONERS — STATUTES.

   A provision of the Interstate Agreement on Detainers which requires dismissal of charges against a defendant incarcerated in another state who has been brought to Michigan to face charges and then returned to the original place of imprisonment without a trial being had is not violated where the return to the original place of imprisonment, while awaiting trial in Michigan, is made at the defendant's request and enables the defendant to continue in a rehabilitation program which is not available in the Michigan facilities in which the defendant would be held (MCL 780.601, Art IV[e]; MSA 4.147[1], Art IV[e]).

2. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — DELAY
   OF TRIAL — STATUTES.

   A prisoner who is brought from another state pursuant to the Interstate Agreement on Detainers for purposes of trial is to be brought to trial within 120 days of his arrival in the receiving state or the charges should be dismissed; however, any necessary and reasonable continuance granted in open court with the prisoner or his counsel present is not included in the 120 days, the trial court may toll the time period for any time the

prisoner is unable to stand trial, and any delay caused by the prisoner's request or to accommodate the prisoner is not included in the 120-day period (MCL 780.601, Arts IV[c], V[c], VI[a]; MSA 4.147[1], Arts IV[c], V[c], VI[a]).

3. Criminal Law — Evidence — Prior Similar Acts.

Evidence of a defendant's other bad acts is admissible to show the defendant's motive, plan or scheme upon a showing of substantial evidence indicating that the defendant actually committed the other acts; that the defendant committed the other acts need not be proven beyond a reasonable doubt, however, and the prosecutor need only show that the defendant probably committed the other acts or that the evidence offered may tend to show the defendant's intent or common scheme in committing the charged offense.

4. Criminal Law — Evidence — Hearsay — Prior Similar Acts.

Hearsay evidence which is objected to by opposing counsel and which is not within one of the recognized exceptions to the hearsay rule is incompetent and inadmissible and cannot be relied upon by a prosecutor to establish the probability that a criminal defendant committed prior similar bad acts.

5. Evidence — Business Records — Copies — Statutes.

A photographic or micro film copy of an original business record permitted by law to be destroyed is deemed to be an original record for all purposes and is to be treated as an original record in court for purposes of admissibility in evidence (MCL 600.2148[2]; MSA 27A.2148[2]).

6. Evidence — Documents — Copies — Public Officers — Statutes.

Copies of all documents required or permitted by law to be filed by any public officer in his office, or to be entered or recorded therein and duly filed, can be certified by such officer to be true transcripts compared by him with the original in his office and thereafter are admissible in evidence in court as if they were the original documents (MCL 600.2107; MSA 27A.2107).

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward R. Wilson,* Principal Attorney, Appeals, and *Nels L. Olson,* Assistant Prosecuting Attorney, for the people.

*Robert L. Ziolkowski,* for defendant on appeal.

Before: ALLEN, P.J., and V. J. BRENNAN and MACKENZIE, JJ.

ALLEN, P.J. On June 16, 1976, defendant began serving a one-year sentence at the Federal prison in Marion, Illinois for violation of a Federal statute governing uttering and publishing. On October 7, 1976, a warrant was issued by Recorder's Court charging defendant with two counts of obtaining money by false pretenses, MCL 750.218; MSA 28.415, and two counts of possession of a stolen vehicle with intent to pass title thereto, MCL 257.254; MSA 9.1954. On October 13, 1976, a writ of habeas corpus ad prosequendum was issued ordering defendant's transfer from Marion to the Federal Correctional Institution at Milan, Michigan. Pursuant to said writ, he was transported by Federal marshals to Milan on October 27, 1976, and on October 28, 1976, was arraigned in Recorder's Court. On the same day, he was returned to Federal authorities in Milan.

On November 3, 1976, he was again transferred from Milan to Recorder's Court for purposes of preliminary examination. Examination was waived and defendant requested that a detainer not be filed because, if he were returned to Marion, he could be transferred to a Federal half-way house in Detroit. On November 3, 1976, defendant was returned to Milan and three days later was returned to Marion, Illinois. On December 12, 1976, he was transferred by Federal authorities from Marion to the Federal Community Treatment Center in Detroit where he remained until March 1977 when he was transferred to the Wayne

County Jail. Following several trial adjournments, allegedly for the purpose of finalizing plea negotiations, defendant was tried by jury May 18, 1977, and found guilty on all four counts.

Prior to trial, defendant moved to quash the information on grounds that the Interstate Agreement on Detainers (IAD), MCL 780.601; MSA 4.147(1), under which defendant was returned to Michigan, was violated and, accordingly, the Recorder's Court was without jurisdiction to try defendant. The motion was denied April 26, 1977. On May 27, 1977, defendant was sentenced to six years, eight months, to ten years in prison. He appeals of right raising four questions.

I. Was Article IV(e) of the Interstate Agreement on Detainers Violated?

Defendant contends that Article IV(e) of the IAD, which reads:

"If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V(e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice."

was violated: (1) on October 28, 1976, when following arraignment he was returned to Milan rather than being held by Wayne County authorities; (2) on November 3, 1976, when following waiver of preliminary examination he was again returned to Milan rather than being held by Wayne authorities; (3) on November 6, 1976, when he was returned to the place of his original incarceration at Marion, Illinois. This Court's holding in *People v Estelle,* 93 Mich App 449; 287 NW2d 262 (1979), is

dispositive of defendant's argument.[1] In that case, as here, the defendant was by writ of habeas corpus ad prosequendum transferred from a Federal prison in another state to the Federal Holding Facility at Milan where he was held until his arraignment in Macomb County Circuit Court. Following arraignment, he was advised that his trial would be delayed about four weeks unless he chose to be tried by another judge. The defendant elected to await the assigned judge's return and the question arose whether the defendant should await trial at the Macomb County jail or at Milan. The defendant indicated he preferred Milan and was transferred there where he remained for one month before trial. On appeal, he claimed his transfer to Milan rather than being held by Macomb authorities was a breach of Article IV(e) of the IAD. This argument was rejected, our Court saying:

"On this question of first impression we are asked to decide whether Article IV(e) of the Interstate Agreement on Detainers, MCL 780.601; MSA 4.147, requires dismissal with prejudice of the information where, following arraignment but before trial on charges of armed robbery, the defendant, who had been brought to Michigan from the Federal penitentiary in Atlanta, Georgia, was returned to Federal custody at the Federal Holding Facility at Milan, Michigan, rather than being confined in the Macomb County jail pending trial. We answer this question in the negative.

\* \* \*

"Viewed in the totality of the circumstances involved

[1] The Estelle opinion was released subsequent to briefs being filed in the instant case. As a consequence, the briefs concentrated on the issue of whether a writ of habeas corpus ad prosequendum was a detainer as held in *People v Beamon,* 83 Mich App 121, 133; 268 NW2d 310 (1978), *lv den* 403 Mich 850 (1978), and whether *Beamon* has been overruled by *United States v Mauro,* 436 US 340; 98 S Ct 1834; 56 L Ed 2d 329 (1978).

we do not find the confinement of defendant at the Holding Facility in Milan a violation of the proscription of Article IV(e) of the IAD. In reaching this conclusion we find it unnecessary to decide whether *Mauro, supra, [United States v Mauro* 436 US 340; 98 S Ct 1834; 56 L Ed 2d 329 (1978)], overrules this Court's decision in *Beamon, supra [People v Beamon,* 83 Mich App 121; 268 NW2d 310 (1978)]. * * * Article I of the IAD states that the purpose behind the statute is to prevent the disruption of an inmate's rehabilitation when a detainer is lodged against him. As was stated in *Christian v United States,* 394 A2d 1, 40 (DC App, 1978):

" 'There is nothing in the legislative history or in the Agreement itself to indicate that its provisions were intended to apply to persons who were not involved in rehabilitative programs. Article IV(e) was designed to avoid the shuttling back and forth between jurisdictions and the resulting disruptive effect such transfers would have on a consistent treatment program and to promote the speedy disposition of outstanding charges upon which the detainers were based.'

"In the instant case the defendant was not being shuttled back and forth between the county jail and a Federal prison but was held only for a brief stated period of time awaiting trial. Neither can it be said that his right to an uninterrupted program of rehabilitation was infringed upon. Neither at the Milan Holding Facility or at the Macomb County jail could the defendant participate in a program of rehabilitation, since neither institution offered such programs." 93 Mich App at 450-451, 453-454.

*Estelle* is squarely on point for our conclusion that defendant's return to Milan following arraignment October 28th, and following waiver of preliminary examination on November 3, 1976, was not violative of the IAD. The only relevant difference between the instant situation and *Estelle* is that here defendant was returned "to the original place of imprisonment". However, his return was at his own request and made possible

continuation of a program of rehabilitation which was not offered at either Milan or the Wayne County jail. As was noted in *Christian v United States, supra,* Article IV(e) was designed to avoid the disruptive effect that shuttling prisoners back and forth from one jurisdiction to another would have on rehabilitative programs. In the instant case, defendant's brief return to Illinois made it possible for defendant to participate in rehabilitation for the three-month period from December 12, 1976, to March 11, 1977, when he was finally placed in the Wayne County jail. We find no violation.

II. Was Article IV(c) of the Interstate Agreement on Detainers Violated?

Defendant next argues that because trial was not commenced until some 202 days after defendant's arrival in Michigan, Article IV(c) of the IAD, which requires trial within 120 days, was violated. Article IV(c) reads:

"In respect of any proceeding made possible by this Article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

This section provides that when a prisoner is sent from one state to another for purposes of trial, he shall be brought to trial within 120 days after his arrival in the receiving state. If the prisoner is not brought to trial within the 120-day period, the trial court should enter an order dismissing the charge. Art V(c). There are, however, three important limitations on the 120-day rule. First, the trial court may grant any necessary and reason-

able continuance for good cause shown in open court with the prisoner or his counsel present, and this time does not count in the 120-day period. Art IV(c). Second, the court may toll the time periods established by the IAD for as long as the prisoner is unable to stand trial. Art VI(a), *United States v Mason,* 372 F Supp 651 (ND Ohio, 1973). And finally, if a delay is caused by the defendant's request or in order to accommodate the defendant, the period of delay attributable to defendant is not used in calculating the 120-day time period. *People v Stroble,* 31 Mich App 94, 99; 187 NW2d 474 (1971), *lv den* 384 Mich 842 (1971), *People v Bernstein,* 74 Misc 2d 714; 344 NYS2d 786 (1973), *People v Leonard,* 18 Ill App 3d 527; 310 NE2d 15, 17 (1974), *Neville v Friedman,* 67 Ill 2d 488; 10 Ill Dec 575; 367 NE2d 1341 (1977), *cf. United States v Scallion,* 548 F2d 1168 (CA 5, 1977). Compare, *Stroble v Egeler,* 547 F2d 339 (CA 6, 1977), *after remand, Stroble v Anderson,* 587 F2d 830 (CA 6, 1978), *cert den* 440 US 940; 99 S Ct 1289; 59 L Ed 2d 499 (1979).

In the case at bar, the prosecution contends that substantial portions of the delay were attributable to defendant. This is denied by defendant who also contends that the several adjournments in trial were made in open court when neither defendant nor his counsel were present.[2] The problem is that given the present state of the record, it is impossible to determine the basis for the various adjournments or whether the defendant or his counsel were present when such adjournments were granted. Transcripts of the proceedings on the various adjournment dates are not provided by either party to this appeal. Nevertheless, we are

---

[2] Adjournments of record were made November 9 and December 22, 1976, and January 7, 13 and 20, 1977. Neither defendant nor his counsel were present.

provided with the transcript from the hearings on April 19 and 26, 1977, which were held to determine, among other things, whether the delays in bringing defendant to trial on the instant charges were in fact attributable to the defendant. In this regard the trial court ruled:

"* * * it does appear to me and I find as a fact that Mr. Cook did initiate the failure of the Detroit Police to file a detainer and also did engage in, for a period of time prior to January of '77, agreements that delayed the disposition of the State matter.

"* * * And I find that Mr. Cook is estopped to assert a violation of the 120 day rule for the period of time during which the negotiations were going on.

"* * * based upon the testimony the Court finds that the 120 day period did not begin to run until January 31st of '77 and 120 days will not have expired by the trial date in this matter, May 18, 1977.

"Therefore, there is no Article 4c violation."

The record reveals that defendant initiated and proceeded with negotiations regarding his possible cooperation with the police in their investigation and possible prosecution of alleged co-conspirators. These negotiations continued for a period of at least 88 days. Accordingly, after subtracting the period of delay caused by accommodating the defendant, or per his request, we conclude that there was no violation of Article IV(c) of the IAD.

III. Did the Trial Court Err by Allowing Testimony Concerning Defendant's Sale to Complainant of Three Other Vehicles, Said Testimony Being Admitted Under the Similar Acts Statute, MCL 768.27; MSA 28.1050?

The charges against defendant arose out of his possession of two different stolen vehicles and the subsequent sale of those vehicles, by using invalid registration and title documents from Kentucky, to

Kenneth O'Keefe, sales manager at Floyd Rice Ford, a car dealership in Detroit. On appeal, defendant does not contest the sufficiency or the admissibility of the evidence offered by the prosecution relating to the documentation used to prove that these vehicles were stolen. Rather, he challenges both such aspects of the otherwise uncontested evidence used to prove defendant's other similar acts.

Before trial, the prosecution moved to allow the introduction of evidence indicating that defendant had sold three other stolen vehicles to the Floyd Rice Ford car dealer. The trial court ruled that, notwithstanding the prejudicial impact of such evidence, it would be admissible under the similar acts statute to establish defendant's intent and common scheme, plan or system in selling the two stolen vehicles to the car dealer. MCL 768.27; MSA 28.1050, see MRE 404(b). Defendant does not challenge the trial court's ruling that the uncharged criminal acts could be appropriately admitted under the similar acts statute since the acts were probative of defendant's intent and common scheme in committing the charged offenses, and were "indispute" to the extent that the evidence was used to prove defendant's criminal intent to obtain money by false pretenses. *People v Wilkins,* 82 Mich App 260, 267-270; 266 NW2d 781 (1978), *lv den* 406 Mich 857 (1979), *People v Ernest Smith,* 87 Mich App 18; 273 NW2d 573 (1978). Rather, the sole basis of defendant's claim on appeal with regard to this evidence is that there was insufficient evidence that defendant actually perpetrated the bad acts sought to be relied upon.

The rule is that evidence of other bad acts is admissible upon a showing of, *inter alia,* substantial evidence indicating that the defendant com-

mitted the other acts. *People v Wilkins, supra,* at 267, *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955). The evidence of similar acts need not be proven beyond a reasonable doubt. *People v Allen,* 351 Mich 535, 547; 88 NW2d 433 (1958), *People v Duncan,* 402 Mich 1, 13-14; 260 NW2d 58 (1977). Rather, the prosecutor need only show that the defendant probably committed the other acts, or that the evidence offered "may tend to show" the defendant's intent or common scheme in committing the charged offense. *People v Allen, supra, People v Duncan, supra,* 1 Wharton's Criminal Evidence (13th ed), § 263, p 626, Anno: 3 ALR 784, McCormick, Evidence (2d ed), § 190, pp 451-452.

Defendant contends that the evidence introduced in the instant case was insufficient to establish the purported similar acts of defendant because it was founded on hearsay evidence. We agree that the prosecutor cannot rely on inadmissible hearsay evidence in order to establish the probability of the defendant committing the other similar acts. Generally speaking, hearsay evidence which is objected to by opposing counsel and which is not within one of the recognized exceptions to the rule is incompetent and hence inadmissible. *People v Edwards,* 396 Mich 551; 242 NW2d 739 (1976), MRE 802. Therefore, to the extent that inadmissible hearsay evidence is relied upon as substantive proof that defendant committed the similar acts, it must be concluded that this evidence, standing alone, is insufficient as a matter of law. Hence, the issue presented in the case at bar is whether the prosecutor's proof of defendant's similar acts was sufficient as a matter of law to show that defendant probably committed those acts.

The following testimony was elicited at trial on

this issue. Mr. O'Keefe testified that he conducted business transactions with the defendant on behalf of the Floyd Rice Ford dealership; in particular, that Mr. O'Keefe purchased automobiles from the defendant for the car dealership. Mr. O'Keefe further testified that he had personal knowledge that five of the cars purchased from the defendant were later discovered to have been stolen. Defendant claims that this testimony constituted inadmissible hearsay evidence since the prosecution failed to produce the true owners of the allegedly stolen vehicles to establish that the vehicles were, in fact, stolen. We do not agree that the prosecutor's failure to produce the original owners of the three vehicles (relating to the similar acts) necessarily means that Mr. O'Keefe was without personal knowledge as to the truth of the proposition that the vehicles were stolen. It is conceivable that somehow he was able to personally determine that the vehicles were stolen. However, since the prosecutor neglected to lay an adequate foundation concerning this matter, and since defendant made a timely objection on the grounds that it was hearsay, it must be concluded that this evidence should not have been considered as probative of the matter for which it was asserted, *i.e.,* that the three vehicles were, in fact, stolen.

Nevertheless, a full reading of the other testimony offered at trial clearly indicates that substantial evidence was introduced which directly and inferentially established that the three vehicles had been stolen, and that the documentation used to transfer title to those vehicles was invalid.

Benjamin Viele, Administrative Assistant to the Director of Driver & Vehicle Services for the Michigan Department of State, testified at trial that his duties in that capacity were to keep all

vehicle registration and title records in Michigan and to investigate Michigan vehicle titles. In that regard, Mr. Viele testified that when the title documentation from Floyd Rice Ford concerning the three vehicles in question came into his office, he microfilmed and then destroyed all the original documents and then forwarded the original titles to their purported place of origin, the state of Kentucky. Subsequently, Mr. Viele was informed by the Kentucky state police that the Kentucky titles had been missing or stolen from one of their counties and that the vehicles described on these titles had never been titled or registered in that state. This information was confirmed at trial by Detective William Zopff of the Kentucky state police, assistant commander of the auto theft section. His function in that capacity was keeper of the records for Kentucky vehicle registration and title records. In that capacity, Detective Zopff testified that the Kentucky control numbers for title registration certificates found on the certificates for the three cars sold by the defendant to Floyd Rice Ford had been among the 31 titles stolen from a county clerk's office sometime before, and that, therefore, they were fraudulent and invalid. In addition, three officers from the Detroit police department commercial auto theft section testified to having investigated and determined that each of the three cars represented in the fraudulent certificates of title had, in fact, been stolen from Indiana and Kentucky. These vehicles were later confiscated by the officers in and about the Detroit area from their private "owners" and, after comparing the confidential vehicle identification numbers, determined to be the stolen vehicles represented in the registration certificates stolen from the Kentucky county clerk.

Based on the foregoing testimony, none of which constituted inadmissible hearsay, it is clear beyond peradventure that substantial evidence was introduced by the prosecutor which directly established that stolen title registration certificates were used by defendant to sell stolen vehicles to Floyd Rice Ford. Although much of the foregoing testimony would have been admissible under the public records/business records exceptions to the hearsay rule, *Pirkner v Purdon,* 27 Mich App 476; 183 NW2d 598 (1970), *Gilliland v Baldwin-Lima-Hamilton Corp,* 52 Mich App 489; 218 NW2d 63 (1974), and see MRE 803(8), it was unnecessary to do so since each of the witnesses provided the critical information from their own personal knowledge of the facts. Accordingly, we conclude that the prosecutor's proof of each of the elements of the similar acts purportedly committed by defendant was sufficient as a matter of law to show that defendant probably committed those acts.

IV. Did the Trial Court Commit Reversible Error by Allowing into Evidence Public Documents Not Officially Stamped Certified by the Public Official in Charge of Such Documents, in Violation of the Best Evidence Rule?

Defendant contends that the trial court erred in admitting into evidence packets purporting to show the title history of the three automobiles which were the basis of the similar acts evidence. The packets were not certified copies of the originals of the title documents and, therefore, defendant contends, they were inadmissible. The prosecutor responds that since Mr. Viele was the individual who maintained the title records in this case, he could properly authenticate the packets during his testimony.

We hold that the photo-copied and microfilmed

copies of the title records for the three vehicles were admissible under either or both of the following exceptions to the best evidence rule. First, § 2148 of the Revised Judicature Act states that a "photographic, photostatic, microfilm, microcard or miniature photographic copy or reproduction" of an original business record permitted to be destroyed "shall be deemed to be an original record for all purposes, and shall be treated as an original record in all courts * * * for the purpose of its admissibility in evidence", MCL 600.2148(2); MSA 27A.2148(2). Since Mr. Viele testified that the original documents in all title records are microfilmed or photo-copied and then destroyed, and since the operations of instrumentalities of government constitute "business" within the meaning of the statute, *Birkner v Purdon, supra,* the trial court was correct in construing the title records as "original" for the purpose of the best evidence rule. See MRE 1003. Second, copies of all documents required or permitted by law to be filed by any public officer in his office, or to be entered or recorded therein and duly filed, can be certified by such officer to be true transcripts compared by him with the original in his office and thereafter shall be admissible in evidence in all courts as if they were the original documents. MCL 600.2107; MSA 27A.2107. Although none of the three title records was *stamped* certified as correct by the custodian or person authorized to make the certification, it is clear that the prosecutor exceeded the statutory requirement by calling the actual custodian of the records (qua Mr. Viele) who testified that the records were a correct and compared copy of the original. Compare MRE 902(4), 1005. Accordingly, the trial court did not err in admitting into evidence, over defense objections on the basis of the

best evidence rule, the microfilms and photocopies of the title records to the three vehicles which were the basis of the similar acts evidence.

Affirmed.