PEOPLE v MONASTERSKI

PEOPLE v MUNDE

Docket Nos. 49728, 50034. Submitted December 3, 1980, at Detroit.—
Decided April 22, 1981. Leave to appeal denied, 411 Mich 1017.

Raymond Monasterski and John Munde were jointly tried on
charges of felony murder and armed robbery. Defendants
moved to suppress introduction of evidence of similar acts,
which motion was denied by the trial court. Defendants sought
leave to appeal the interlocutory order to the Court of Appeals
which, in lieu of granting leave, and on its own motion,
reversed the order of the trial court. Following trial, a jury
found Monasterski guilty as charged, but found Munde guilty
of armed robbery and involuntary manslaughter, Detroit Re-
corder's Court, Leonard Townsend, J. Both defendants appeal.
The appeals were consolidated by the Court of Appeals. *Held:*

1. The Interstate Agreement on Detainers Act does not apply
to the facts of the case. Defendants were in custody pending
extradition and were not serving a term of imprisonment in the
custodial state.

2. The trial court properly exercised its discretion in allowing
the admission of evidence of defendants' prior convictions for
the purpose of impeachment of their credibility after carefully
weighing the necessary factors.

3. The trial court erred in instructing the jury, *sua sponte,*

REFERENCES FOR POINTS IN HEADNOTES

[1-3] 21 Am Jur 2d, Criminal Law §§ 250.1, 250.2.
Validity, Construction, and Application of Interstate Agreement on
Detainers. 98 ALR3d 160.
[4] 20 Am Jur 2d, Courts § 69.
29 Am Jur 2d, Evidence § 327.
[5] 29 Am Jur 2d, Evidence § 327.
[6] 81 Am Jur 2d, Witnesses § 480.
[7] 75 Am Jur 2d, Trial § 858.
[8] 76 Am Jur 2d, Trial §§ 1161, 1162.
Inconsistency of criminal verdicts as between two or more defen-
dants tried together. 22 ALR3d 717.
[9] 21 Am Jur 2d, Criminal Law §§ 533, 545.
Right to credit for time spent in custody prior to trial or sentence.
77 ALR3d 182.

following closing arguments to disregard testimony elicted by defendants regarding an informant's motive for testifying. This instruction resulted in prejudice to the defendants and necessitates reversal.

4. The trial court erred in permitting testimony regarding defendants' alleged similar acts in violation of the order of the Court of Appeals.

5. A jury in a criminal case may render inconsistent verdicts where there are multiple defendants. Therefore, the jury's verdict of involuntary manslaughter relative to defendant Munde, while inconsistent with its verdict of felony murder relative to defendant Monasterski, is not grounds for reversal.

6. Defendant Munde is not entitled to credit for the time he served on an unrelated offense prior to his extradition.

Reversed and remanded.

1. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — STATUTES.

The provisions of the Interstate Agreement on Detainers Act are actuated only upon the filing of a detainer with a custodial state by a state having untried charges pending against a prisoner serving a term of imprisonment in the custodial state (MCL 780.601 et seq.; MSA 4.147[1] et seq.).

2. CRIMINAL LAW — DETAINERS — WORDS AND PHRASES — INTERSTATE AGREEMENT ON DETAINERS — STATUTES.

A "detainer" under the Interstate Agreement on Detainers Act is a notification by a state which is filed with the institution in another state in which a prisoner is serving a sentence advising the custodial state that the prisoner is wanted to face pending criminal charges in the filing state, and a letter by local police authorities so informing a custodial sheriff is sufficient to constitute a detainer (MCL 780.601 et seq.; MSA 4.147[1] et seq.).

3. CRIMINAL LAW — INTERSTATE AGREEMENT ON DETAINERS — STATUTES.

The Interstate Agreement on Detainers Act does not apply where the requested prisoner is in custody pending extradition and is not actually serving a term of imprisonment (MCL 780.601 et seq.; MSA 4.147[1] et seq.).

4. CRIMINAL LAW — COURTS — EVIDENCE — PRIOR CONVICTIONS — IMPEACHMENT — JUDICIAL DISCRETION.

A trial court, in exercising its discretion whether or not to allow admission of evidence of a defendant's prior convictions for the

purpose of attacking his credibility, must weigh the nature of the prior offense relative to 1) its direct bearing on credibility, 2) whether the prior conviction was for substantially the same conduct for which the defendant is on trial, considering whether the offenses are so closely related as to allow the jury to infer the likelihood that the defendant committed the crime charged, creating prejudice which outweighs the probative value of the evidence on the issue of credibility, and 3) the effect on the decisional process if the defendant fails to testify out of fear of impeachment.

5. CRIMINAL LAW — EVIDENCE — PRIOR CONVICTIONS — CROSS-EXAMINATION.

A trial court, after considering the factors necessary to determine admissibility of evidence of prior convictions for impeachment, may allow a defendant to be cross-examined relative to his previous felony convictions where there is a direct conflict between his testimony and that of a key witness and the outcome of the case may well depend on its resolution by the jury.

6. CRIMINAL LAW — CROSS-EXAMINATION — DEFENDANTS.

Generally, a defendant in a criminal case has wide latitude in cross-examining prosecution witnesses regarding their motive for testifying, and this rule should be enforced strictly where a witness is a codefendant or accomplice whose testimony may be influenced by promises or expectancies of leniency or immunity; a defendant is entitled to have the jury consider any fact which might have influenced an informant's testimony.

7. CRIMINAL LAW — JURY INSTRUCTIONS — MOTIVES FOR TESTIMONY.

An instruction to a jury by a trial court, *sua sponte,* following closing arguments in a criminal case to disregard testimony elicited by a defendant from a key witness or an accomplice regarding the witness's possible motive for testifying constitutes error requiring reversal.

8. CRIMINAL LAW — JURY — INCONSISTENT VERDICTS.

A jury in a criminal case may render inconsistent verdicts among multiple defendants.

9. CRIMINAL LAW — SENTENCING — CREDIT FOR TIME SERVED.

A criminal defendant is not entitled to credit for time served on unrelated offenses or post-conviction time served on a related offense, and where he has served time prior to conviction for a related offense he is entitled to credit for the time served only where the imprisonment bears an intimate and substantial

relationship to the crime for which he is subsequently convicted.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Edward Reilly Wilson,* Principal Attorney, Appeals, and *Timothy A. Baughman,* Assistant Prosecuting Attorney, for the people.

*Steven Fishman,* for defendant Monasterski.

*Mark E. Weiss,* for defendant Munde.

Before: D. C. RILEY, P.J., and D. E. HOLBROOK, JR., and M. B. BREIGHNER,* JJ.

D. C. RILEY, P.J. Defendants, Raymond Monasterski and John Munde, were each charged with the crimes of felony murder, MCL 750.316; MSA 28.548, and armed robbery, MCL 750.529; MSA 28.797, and were tried jointly before a jury. On May 9, 1979, a Detroit Recorder's Court jury found Monasterski guilty as charged but found Munde guilty of armed robbery and guilty of the lesser offense of involuntary manslaughter, MCL 750.321; MSA 28.553. On May 16, 1979, Monasterski was sentenced to the mandatory life sentence in solitary confinement at hard labor on the felony-murder conviction and life in prison on the armed-robbery conviction, the sentences to run concurrently. Munde was sentenced to serve from 10 to 20 years in prison for armed robbery and from 10 to 15 years for manslaughter. Both defendants perfected timely appeals, raising numerous issues, several of which merit discussion here. Since many of the legal issues raised for our consideration are

---

* Circuit judge, sitting on the Court of Appeals by assignment.

common to both defendants, their appeals have been consolidated.

On March 24, 1977, at approximately 11 p.m., three men, two of whom are alleged to have been the defendants, broke into a two-family flat in Detroit. One or more of the three men severely beat the owner, Mr. Thomas, who lived in the lower flat. Mr. Thomas did not survive the attack.

The upper flat was occupied by two tenants. They heard crashing and moaning noises downstairs, apparently in connection with the breaking and entering and the assault on Mr. Thomas. Shortly after hearing the strange sounds emanating from the floor below, two masked men burst into their flat and robbed both of them. Neither tenant was able to positively identify their assailants.

Due to a general lack of evidence linking anyone to the crime, this homicide remained an "open file" for more than six months. Nearly eight months elapsed before charges were brought against defendants.

In November, 1977, a Detroit Police homicide sergeant traveled to Indiana and discussed the Thomas homicide with Umberto Iafrate, who had been arrested along with defendants Monasterski and Munde after allegedly committing a burglary there. Iafrate was offered immunity in exchange for his testimony against Monasterski, Munde, and John Brown, the other codefendant allegedly involved in the Thomas homicide.[1] Agreeing to cooperate, Iafrate was not charged with any crime arising out of the activities on March 24, 1977.

On November 16, 1977, Detroit authorities ob-

---

[1] Defendants were tried jointly with codefendant Brown, whose appeal was disposed of on August 19, 1980, in an unpublished opinion (Docket No. 48291).

tained murder warrants against Munde and Monasterski. A detainer was filed with Indiana authorities on the same date. Following their convictions and sentencings in Indiana, defendants were returned to Michigan and were arraigned on the warrant in the instant case on December 12, 1978. Trial was ultimately set for April 30, 1979.

Defendants brought motions to dismiss, based in part upon alleged noncompliance with the Interstate Agreement on Detainers Act (hereinafter, IAD), MCL 780.601 *et seq.;* MSA 4.147(1) *et seq.,* which were denied. Defendants brought several other pretrial motions as well, including a motion to preclude the introduction of evidence of alleged prior similar acts. Following the denial of the latter motion, which was challenged by way of interlocutory appeal, this Court reversed the trial judge and issued an order disallowing any testimony concerning alleged similar acts, irrespective of whether such testimony would come from the informant, police officers, or by alleged prior victims.

The testimony of informant Iafrate was the heart of the prosecution's case against the defendants. Although his testimony was subject to the order issued by this Court that he was not to testify concerning alleged prior similar acts by the defendants, during trial Iafrate in fact gave such testimony in response to the defendants' cross-examinations. A joint motion for mistrial was subsequently made and denied.

The first four issues that merit discussion are common to both Monasterski and Munde and will, therefore, be discussed first. The last two issues are pertinent only to defendant Munde and will be considered separately at the end of our opinion.

The first question on appeal is whether the IAD

is applicable to the facts of this case and, if it is, whether Article IV(c) was violated because defendants were not tried within 120 days of their transfer to Michigan.

Article IV(c) of the IAD provides as follows:

"(c) In respect of any proceeding made possible by this Article, trial shall be commenced within one hundred twenty days of the arrival of the prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance."

Article V(c) of the IAD provides the statutory remedy in the event that Article IV(c) is violated:

"[I]n the event that an action on the indictment, information or complaint on the basis of which the detainer has been lodged is not brought to trial within the period provided in Article III or Article IV hereof, the appropriate court of jurisdiction where the indictment, information or complaint has been pending shall enter an order dismissing the same with prejudice * * *."

The threshold issue which we must decide is whether, under the facts of this case, the IAD should even apply. The people claim that it should not, contending that defendants were extradited under the Uniform Criminal Extradition Act, MCL 780.1 *et seq.;* MSA 28.1285(1) *et seq.*

As the Supreme Court recognized in *United States v Mauro,* 436 US 340, 343; 98 S Ct 1834; 56 L Ed 2d 329 (1978), "the provisions of the Agreement are triggered only when a 'detainer' is filed with the custodial (sending) State by another State (receiving) having untried charges pending against the prisoner * * *." Although the IAD does not

define "detainer", legislative history reveals that it is simply "'a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." *Id.,* 359. See S Rep No 91-1356, 91st Cong, 2d Sess 2, *reprinted in* [1970] US Code Cong & Ad News 4864, 4865.

In the instant case, on November 16, 1977, the same date that the local police authorities obtained an arrest warrant against defendants, a certified copy of the warrant was sent to the sheriff in Elkhart County, Indiana, along with the following letter:

"Dear Sir: Enclosed are certified copies of our warrant, No. 77-08731, charging Raymond Monasterski and John Munde * * * with the crimes of Murder First Degree and Robbery Armed. The above subjects are presently in your custody and *it is requested our warrants be allowed as detainers.* Very truly yours, Kesse Koehler, Commander." (Emphasis added.)

This letter is sufficient to constitute a detainer. In *People v Beamon,* 83 Mich App 121, 132; 268 NW2d 310 (1978), another panel of this Court held that a letter from the Recorder's Court clerk to officials at Terre Haute, Indiana, which advised of charges pending against defendant who was incarcerated in Terre Haute, was a detainer. This ruling is in accord with the definition of detainer that appears in the legislative history of the federal enactment of the IAD as previously quoted.

Although the filing of a detainer with the sending state is a necessary condition for the triggering of the IAD, it is not, in itself, sufficient. The purpose of the IAD is to require states to dispose of detainers in an expeditious manner in order to prevent interference with a prisoner's participa-

tion in programs of treatment and rehabilitation. Consistent with this purpose, and in light of Article IV of the IAD, which references the lodging of a detainer only to prisoners who are "serving a term of imprisonment in any party state * * *", many courts have taken the position that the IAD does not apply unless the prisoner is actually serving a term of imprisonment in the sending state. See Anno: *Validity, construction, and application of interstate agreement on detainers,* 98 ALR3d 160, 185.

Several panels of this Court have reached the same conclusion. In *People v McLemore,* 95 Mich App 536, 547; 291 NW2d 109 (1980), for example, the Court held that "a prisoner who is in custody solely pending prosecution on criminal charges does not yet have a program of rehabilitation to be disrupted. * * * [T]he Agreement does not apply unless the prisoner is actually serving a term of imprisonment." See also *People v Butcher,* 46 Mich App 40; 207 NW2d 430 (1973).

The IAD does not apply in the instant case because defendants had not embarked upon a program of rehabilitation in Indiana. Both were being held in a county jail in Indiana pending "extradition". The detainers were filed before defendants were tried in Indiana, and there is nothing in the record that would indicate that any rehabilitation program had begun. While it is true that the defendants were *sentenced* prior to being sent to Michigan, we do not consider that fact particularly important since the detainer was lodged *prior* to their trials, and neither had embarked upon any program of rehabilitation in Indiana. *People v Estelle,* 93 Mich App 449; 287 NW2d 262 (1979), *People v Cook,* 95 Mich App 645; 291 NW2d 152 (1980).

Defendants also contend that the trial court abused its discretion in refusing to suppress evidence of their prior convictions for breaking and entering. At the pretrial motion to suppress, defendants argued that their prior convictions were for the same conduct as the underlying felony of their felony-murder charges and that evidence of these convictions would, therefore, be substantially more prejudicial than probative. Near the end of trial both defendants stated on the record that their decision not to testify on their own behalf was a direct result of the judge's decision not to suppress their prior records.

The decision to allow impeachment of a defendant by evidence of prior convictions is within the discretion of the court but requires the court to determine whether the probative value of the evidence on the issue of credibility outweighs its prejudicial effect. MRE 609.

In *People v Crawford,* 83 Mich App 35, 39; 268 NW2d 275 (1978), this Court enumerated the factors to be considered in determining whether a prior conviction should be admissible to impeach a defendant's credibility: (1) the nature of the prior offense and its bearing on defendant's credibility, (2) whether it is for substantially the same conduct for which defendant is on trial, with closely related offenses requiring close scrutiny due to the likelihood of prejudice and, (3) the effect on the decisional process if the defendant does not testify out of fear of impeachment.

In the instant case, the judge carefully weighed these factors and decided to deny the motions to suppress. His ruling was based primarily on two factors. First, defendants' defense was alibi, which, the court reasoned, could be fully presented by defendants' alibi witness even if defendants chose

not to testify. Second, the case was essentially a credibility contest between defendants and the informant Iafrate, who would be impeached at trial by his own prior criminal record.

Although it is true that a judge should exercise extreme caution in permitting prior convictions that are very similar in nature to the pending charges to be used for impeachment purposes, we have repeatedly held that evidence of such prior convictions need not be excluded merely because it involved crimes of a similar nature to the crime charged. *People v Townsend,* 60 Mich App 204, 206; 230 NW2d 378 (1975). The key question is always whether the probative value of admitting the evidence on the issue of credibility outweighs its prejudicial effect.

This Court has often approved of the principle first enunciated in *Gordon v United States,* 127 US App DC 343; 383 F2d 936 (1967), that it is proper for a trial court to allow a defendant to be cross-examined as to his previous felony convictions where there is a direct conflict between the testimony of a key witness and the defendant with the jury verdict likely turning on how the conflict is resolved by the jury. See *People v Kelly,* 66 Mich App 634; 239 NW2d 691 (1976). The following passage from *Gordon, supra,* 348, is particularly instructive:

"[W]e note that the admission of Appellant's criminal record here, along with the criminal record of the complaining witness, was not in a vindictive or 'eye for an eye' sense, as Appellant argues. *Rather it was received because the case had narrowed to the credibility of two persons—the accused and his accuser—and in those circumstances there was greater, not less, compelling reason for exploring all avenues which would shed light on which of the two witnesses was to be believed."* (Emphasis added.)

Just as in *Gordon,* the instant case was essentially a credibility contest between defendants and their alleged accomplice-turned-informer, Iafrate. There was, therefore, a compelling reason to permit the jury to explore all avenues which could shed light on whom to believe.

And, as the trial judge correctly noted, the decisional process was not adversely affected in this case due to defendants' decision not to testify out of their alleged fear of impeachment since they were able to fully present their alibi defenses through another witness. We hold that the trial judge properly applied the *Crawford* factors in this case and that he, therefore, did not abuse his discretion by failing to suppress evidence of defendants' criminal records.

Next we meet the question of whether the trial court committed error requiring reversal by instructing the jury *sua sponte,* after closing arguments, to disregard testimony which defendants had elicited during trial that the police had interceded in a later, unrelated case on behalf of witness Iafrate.

As we have noted, since there was no identification evidence in the case other than the testimony of Umberto Iafrate, the admitted accomplice, Iafrate's credibility was the key issue in the case. The fact that Iafrate was testifying in exchange for immunity was placed before the jury. Following a brief hearing outside the presence of the jury, the officer in charge of the case testified that after he had agreed to give Iafrate immunity in exchange for his testimony he placed a phone call to the Sterling Heights Police on Iafrate's behalf after it came to his attention that Iafrate had been arrested in Sterling Heights for carrying a concealed weapon (CCW). The people did not object to this

testimony. To the contrary, it was approved by both the court and the prosecutor.

After closing arguments, the trial court announced, *sua sponte,* that it would instruct the jury to disregard the testimony concerning the telephone call of the officer in charge to the Sterling Heights Police on the CCW charge. Over defense counsels' objections, the court proceeded to give the instruction. The judge ruled that the evidence was irrelevant and had no tendency to impeach Iafrate.

As a general rule, courts have granted defendants wide latitude in cross-examining prosecution witnesses with respect to their motive for testifying. This rule has been strictly enforced where such witnesses are also codefendants or accomplices of the defendant since their testimony against the defendant is often influenced by promises or expectancies of leniency or immunity. Anno: *Preventing or limiting cross-examination of prosecution's witness as to his motive for testifying,* 62 ALR2d 610, 624. Defendants are entitled to have the jury consider any fact which might have influenced an informant's testimony. As the Supreme Court ruled in *People v Atkins,* 397 Mich 163, 174; 243 NW2d 292 (1976):

"The focus of required disclosure is not on factors which may motivate a prosecutor in dealing subsequently with a witness, but rather on facts which *may motivate the witness in giving certain testimony."* (Emphasis added.)

The people's contention that the phone call on the CCW charge is irrelevant because it came after Iafrate had agreed to testify is simply wrong. "The interest of a witness is never irrelevant * * *." *People v Sesson,* 45 Mich App 288, 302; 206 NW2d

495 (1973). In the instant case, for example, the jury may have concluded that the phone call constituted special treatment afforded the informant which may have influenced his testimony at trial.

The importance of broad cross-examination in establishing an informant's interest in testifying and the narrow scope of the trial judge's discretion with respect to such cross-examination was recognized by this Court in *People v Bell,* 88 Mich App 345; 276 NW2d 605 (1979). In *Bell,* defendant alleged on appeal that the trial judge unreasonably had restricted cross-examination of the state's chief witness. Although the prosecutor, himself, had established on direct examination that the witness's testimony was offered in exchange for permitting him to plead guilty to a lesser charge, the trial judge denied defense counsel the opportunity to inquire whether the witness had been advised that the original charge against him was a nonprobationable offense, whereas, the charge he pled to was probationable.

Recognizing the importance of a defendant's right to cross-examine a witness on the witness's possible motive for testifying falsely, especially where such witness is the star witness or an accomplice, the *Bell* court reversed defendant's conviction. The same result is mandated here. For the reasons outlined above, we cannot say the court's error was harmless. The trial court's instruction, *sua sponte,* prejudicially undercut defendants' closing arguments and effectively prevented the jury from considering evidence that may have had a bearing on Iafrate's bias and motive for testifying. See *People v Mann,* 395 Mich 472; 236 NW2d 509 (1975).

Finally, we note that testimony was produced at trial that the defendants had participated in nu-

merous other robberies. This testimony was in direct violation of our April 25, 1979, order that no testimony be produced at trial by any witness concerning alleged similar acts. On retrial, special care should be taken by all counsel and the court to insure that our order is given strict compliance.

Defendant Munde has raised two additional issues which are material only to his appeal and which merit brief discussion.

First, defendant Munde contends that his manslaughter conviction should be reversed on the ground that it is inconsistent with his codefendant's conviction for felony murder. Defendant Munde's alleged involvement in the crime was as the driver of the getaway car. The testimony against him was that he dropped off the other participants and drove away, picking them up later at a prearranged location. .

The Supreme Court, in accord with the modern view, has abrogated the rule formerly followed in Michigan which required rational consistency among multiple verdicts. *People v Vaughn,* 409 Mich 463; 295 NW2d 354 (1980). As the Court explained:

"Juries are not held to any rules of logic * * *. The ability to convict or acquit another individual of a crime is a grave responsibility and an awesome power. An element of this power is the jury's capacity for leniency." *Id.,* 466.

That the mercy rationale of *Vaughn* is applicable to the instant case seems highly likely given the fact that defendant Munde was the getaway driver and purportedly had no knowledge of the events which caused the victim's death until after the fact.

Although *Vaughn* dealt only with inconsistent

verdicts with respect to a single defendant, its rationale extends logically to inconsistent verdicts among multiple defendants, and the weight of authority so holds. See Anno: *Inconsistency of criminal verdicts as between two or more defendants tried together,* 22 ALR3d 717, and cases collected therein. In *People v Stone,* 213 Cal App 2d 260; 28 Cal Rptr 522 (1963), for example, the court upheld that defendant's conviction of murder and robbery despite the fact that his codefendant had been acquitted on the murder count and convicted only of robbery. The murder was committed when both defendants in that case were in the course of holding up a supermarket, but the evidence tended to show that that defendant himself, and not his codefendant, fired the fatal shot. While agreeing that the jury's verdict was inconsistent, the court said that it could be explained adequately by the jury's understandable reluctance to fasten a murder conviction upon the man who did not fire the fatal shot. On this rationale, although defendant Munde could have been found guilty of first-degree felony murder, he cannot be heard to complain that the jury instead acted leniently and found him guilty only of manslaughter.

Finally, defendant Munde contends that he is entitled to jail credit for time served in Indiana from November 16, 1977, the date the detainer was filed, until December 12, 1978, the date of his extradition to Michigan. This contention is without merit.

Defendant relies upon MCL 769.11b; MSA 28.1083(2) which allows credit for presentence incarceration under certain circumstances:

"Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to

furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing."

This statute was recently construed by this Court in *People v Tilliard,* 98 Mich App 17; 296 NW2d 180 (1980). In *Tilliard* we said that (1) a defendant is not entitled to credit for time served on unrelated offenses, (2) a defendant is not entitled to post-conviction time served on a related offense "as this is time a defendant is already obligated to serve", and (3) a defendant is only entitled to credit for time served on a related offense for which there has not yet been a conviction where the imprisonment bears "an intimate and substantial relationship to the crime for which such person is subsequently convicted". *Id.,* 21. In this case, all of defendant's time served in Indiana falls within the category of time served on an unrelated offense for which he is not entitled to credit. See also *People v Patterson,* 392 Mich 83; 219 NW2d 31 (1974), *People v Finn,* 74 Mich App 580; 254 NW2d 585 (1977). Therefore, defendant is not entitled to the credit claimed.

Reversed and remanded as to both defendants for a new trial.