THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
ROBERT REILLY, Appellant.

Second Department, April 4, 1988

## APPEARANCES OF COUNSEL

*Philip L. Weinstein (Frederick W. Turner* of counsel), for appellant.

*Elizabeth Holtzman, District Attorney (Barbara D. Underwood, Robin Bernstein* and *James B. Duggan* of counsel), for respondent.

## OPINION OF THE COURT

BRACKEN, J. P.

■ ■ ■ The defendant contends that the judgment convicting him of murder in the second degree must be reversed, and the indictment dismissed, because the prosecution violated certain provisions of the Interstate Agreement on Detainers (hereinafter the IAD), codified in New York as CPL 580.20. We conclude that the prosecution violated neither the language nor the spirit of that compact and that the defendant's principal argument on this appeal is therefore unfounded. We also determine that the remaining arguments advanced by the defendant are either not properly before this court or wholly without substance and that accordingly the judgment appealed from should be affirmed.

## I

In June 1984, a Kings County Grand Jury returned an indictment charging the defendant with the crime of murder in the second degree. It was alleged that on December 1, 1980, in the County of Kings, the defendant intentionally murdered the victim, Raul Varela. That the evidence presented by the prosecution at trial was legally sufficient to prove this charge is beyond dispute.

By notice of motion dated January 7, 1985, the defendant sought a pretrial order dismissing the indictment on the ground that the prosecution had failed to comply with various provisions of the IAD (CPL 580.20). This motion was supported by an affidavit of the defendant's attorney. Based upon a review of that affidavit and of the affirmation in opposition submitted by an Assistant District Attorney, the following facts may be considered to be undisputed.

Prior to his indictment in this case, the defendant had been arrested by Federal officers and delivered by them to the Metropolitan Correctional Center on West Street in New York County, where he was to be held in connection with pending Federal criminal charges. On July 2, 1984, shortly after his indictment in this case, the defendant was sentenced in the United States District Court for the Eastern District of New York, to concurrent terms of 4 and 10 years' imprisonment in connection with the Federal charges. The Federal commitment order indicates that the District Court recommended that the sentence imposed be concurrent with whatever sen-

tence was to be imposed in connection with the pending State murder prosecution.

On July 3, 1984, the day following defendant's sentencing in Federal court, detectives from Kings County allegedly "lodged" an arrest warrant with representatives of the United States Marshal in the Eastern District of New York at the Marshal's office in Brooklyn, New York.

On July 10, 1984, the Supreme Court, Kings County, issued an order addressed to the Superintendent of the Metropolitan Correctional Center, commanding him to produce the defendant at Part 50 of the Criminal Term of the Supreme Court, to be held at the Kings County Courthouse on July 12, 1984, for the purpose of "arraignment and/or trial". This order was presented at the office of the United States Marshal in Brooklyn.

On July 12, 1984, the defendant was escorted by New York City detectives from the Metropolitan Correctional Center, and apparently was transported to the office of the United States Marshal in Brooklyn. Other detectives then escorted the defendant from the detention area of the United States Marshal's office to the Supreme Court, Kings County. The defendant was returned to the United States Marshal immediately after his arraignment on the present indictment.

On July 20, 1984, the authorities at the Metropolitan Correctional Center received the arrest warrant which had been "lodged" at the office of the United States Marshal on July 3, 1984. According to the affirmation in opposition submitted by the Assistant District Attorney, which in part is based upon conversations with Carlyle Holder, the Supervisory Legal Technician in charge of records at the Metropolitan Correctional Center, no action based on the lodging of this warrant could possibly have been taken until that date. Further, since the Metropolitan Correctional Center is a temporary holding facility, no rehabilitative programs were available to the defendant.

On July 30, 1984, the defendant was notified that he was to be transported to a Federal penitentiary in Lompoc, California, where he was to serve his Federal prison sentence. The defendant was then incarcerated in that, or some other Federal prison.

The defendant did not again appear in the New York State Court in Kings County until December 11, 1984. After various pretrial motions and hearings, including application to dismiss

the indictment pursuant to the terms of the IAD, which was denied by order of the Supreme Court, Kings County (Egitto, J.), dated March 22, 1985, the defendant was tried and found guilty of murder in the second degree. He was sentenced on July 11, 1985, to the maximum term of 25 years to life imprisonment. At some time thereafter, the defendant was returned to Federal prison, and the People advise us that he is currently incarcerated at the Federal Correctional Facility at Talladega, Alabama.

## II

Before addressing the defendant's primary contention, it will be helpful to examine the history of the IAD, its underlying purpose, and its relation to other procedures pursuant to which New York, as one sovereign State, may obtain the presence at a criminal trial of a defendant who is in the custody of another State or the United States of America.

CPL 580.10 specifies three separate procedures pursuant to which New York may compel the attendance at a criminal trial in a court of this State of a defendant confined as a prisoner in an institution of another jurisdiction of the United States. These three procedures are set forth in:

(1) CPL 570.12, which provides that, upon agreement of the Governor of this State and the executive authority of the State in which the defendant is imprisoned, the defendant may be extradited to New York,

(2) CPL 580.20 which is the IAD, and

(3) CPL 580.30 which provides that a Federal prisoner may be transferred to the temporary custody of this State.

The Interstate Agreement on Detainers (CPL 580.20) is a compact among 48 States, the District of Columbia, the Virgin Islands, and the United States (see, Carchman v Nash, 473 US 716; 2 Waxner, New York Criminal Practice § 10.23; Fried, *The Interstate Agreement on detainers and the Federal Government,* 6 Hofstra L Rev 493 [1978]). New York adopted this compact in 1957 (L 1957, ch 524 [eff Sept. 1, 1957]) and Congress entered into the IAD on behalf of the United States and the District of Columbia in 1970 (Pub L 91-538, 84 US Stat 1397).

Article IV of the IAD (CPL 580.20, art IV) provides that a prosecutor of a "[r]eceiving state" (CPL 580.20, art II [c]) (in the present case, New York) "shall be entitled" to the production of a prisoner held in another State (or the United States)

"upon presentation of a written request for temporary custody [of the prisoner]" (CPL 580.20, art IV [a]). However, there are certain conditions attached to the exercise of this right. First, the prisoner must be actually "serving a term of imprisonment" at the time that the request is made. Second, a "detainer" must *previously* have been lodged against the prisoner. Third, the State court in which the charges are pending must "have approved, recorded and transmitted the request [for temporary custody]". Fourth, the Governor of the State in which the defendant is imprisoned must be given at least 30 days during which he may refuse to release the prisoner. These conditions are set forth in CPL 580.20, article IV (a) which, in full, provides as follows:

### "ARTICLE IV

"(a) The appropriate officer of the jurisdiction in which an untried indictment, information or complaint is pending shall be entitled to have a prisoner against whom he has lodged a detainer and who is serving a term of imprisonment in any party state made available in accordance with Article V (a) hereof upon presentation of a written request for temporary custody or availability to the appropriate authorities of the state in which the prisoner is incarcerated; provided that the court having jurisdiction of such indictment, information or complaint shall have duly approved, recorded and transmitted the request; and provided further that there shall be a period of thirty days after receipt by the appropriate authorities before the request be honored, within which period the governor of the sending state may disapprove the request for temporary custody or availability, either upon his own motion or upon motion of the prisoner".

It is important to note that the IAD does not contain a definition of the term "detainer", nor does it define the meaning of the verb "to lodge". It is thus unclear what actions constitute the lodging of a detainer "against" a prisoner.

Pursuant to the IAD (CPL 580.20, art IV [c]), whenever a prisoner is produced pursuant to the terms of Article IV (a), the trial of the prisoner must begin within 120 days of his arrival in the "receiving state". This deadline may be extended by the court, upon application of the prosecution. CPL 580.20, article IV (c) provides as follows: "(c) In respect of any proceeding made possible by this Article, trial shall be commenced within one hundred twenty days of the arrival of the

prisoner in the receiving state, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance". It should be noted that this 120-day limitation may be tolled for various reasons pursuant to the IAD (CPL 580.20, art IV; *see, e.g., People v Vrlaku,* 134 AD2d 105).

Furthermore, the IAD provides that a prisoner who has been transferred to the "[r]eceiving state" *(see,* CPL 580.20, art II [c]) must not be returned to his prison in the "[s]ending state" *(see,* CPL 580.20, art II [b]) until after the completion of his trial. Specifically, CPL 580.20, article IV (e) provides as follows: "(e) If trial is not had on any indictment, information or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to Article V (e) hereof, such indictment, information or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice".

While the intricate language of the IAD has engendered difficult problems of statutory construction, the basic purpose of the IAD has not posed the slightest problem for judicial resolution; indeed, there is uncommon unanimity among the State and Federal courts in holding that the essential purpose of the IAD is to prevent lengthy interruption of whatever rehabilitative programs may be available to an inmate who is serving a term of imprisonment. Such interruptions frequently resulted from the often abusive filing of detainers against prisoners. In *Carchman v Nash* (473 US 716, 720, *supra),* the Supreme Court of the United States, quoting the Council of State Governments (Suggested State Legislation, Program for 1957, at 74 [1956]), explained the purpose of the Agreement as follows: " 'The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment, when he is ready for return to society with an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalization and the objective of the correctional system is defeated.' " The court, in *Cuyler v Adams* (449 US 433, 449), quoting from the congressional

reports prepared in connection with the IAD, stated the following: " '[A] prisoner who has had a detainer lodged against him is seriously disadvantaged by such action. He is in custody and therefore in no position to seek witnesses or to preserve his defense. He must often be kept in close custody and is ineligible for desirable work assignments. What is more, when detainers are filed against a prisoner he sometimes loses interest in institutional opportunities because he must serve his sentence without knowing what additional sentences may lie before him, or when, if ever, he will be in a position to employ the education and skills he may be developing.' H.R. Rep. No. 91-1018, p. 3 (1970); S. Rep. No. 91-1356, p. 3 (1970)". Similarly, *People ex rel. Capalongo v Howard* (87 AD2d 242, 243) states that the purpose of the IAD is to "protect the inmate's right to speedy trial and reduce any uncertainties which might obstruct programs of prisoner treatment and rehabilitation".

From the prisoner's standpoint, then, the IAD's essential purpose is to minimize the adverse effects that the filing of a detainer might have on his progress toward rehabilitation, on the availability of various prison programs, and on the opportunity for parole. It is primarily through article III of the IAD that this purpose is accomplished, since it is that article which confers upon the prisoner the right to demand that a State whose officers have filed a detainer against him provide him with a speedy trial (see, CPL 580.20, art III). The defendant in the present case did not avail himself of this right.

With this as background, we turn to an examination of the precise arguments raised by the defendant.

### III

The defendant bases his claim that the indictment should be dismissed on the following assertions: first, he contends that, having been sentenced in Federal court on July 2, 1984, he was, as of that date, "serving a term of imprisonment" in Federal custody (see, CPL 580.20, art IV [a]). Second, he contends that the presentation of the warrant of arrest at the office of the United States Marshal in Brooklyn on July 3, 1984, constituted the "lodging" of a "detainer"; and, third, he claims that the "order to produce him" which was issued by the Supreme Court, Kings County, on July 10, 1984, was, in effect, a "written request for temporary custody" pursuant to article IV of the IAD (CPL 580.20, art IV [a]). The defendant

concludes his argument by asserting that, in accordance with article IV (c) of the IAD, he should have been brought to trial in New York within 120 days of his "arrival" at the Supreme Court for arraignment on July 12, 1984. Since he was not brought to trial within this time frame, the indictment, he argues, should have been dismissed.

We find that the defendant's argument is unfounded, and that several if not all of the assertions upon which this argument is based are incorrect.

## A

First, we determine that the defendant was not "serving a term of imprisonment" within the meaning of article IV (a) of the IAD (CPL 580.20, art IV [a]) at the time that his production in State court was first obtained. For this reason alone, the time constraints of article IV (c) of the IAD do not apply.

18 USC former § 3568, repealed effective Nov. 1 1987 pursuant to section 212 of Pub L 98-473, provided: "[t]he sentence of imprisonment of any person convicted of an offense shall commence to run from the date on which such person is received at the penitentiary, reformatory, or jail for service of such sentence * * * If any such person shall be committed to a jail or other place of detention to await transportation to the place at which his sentence is to be served, his sentence shall commence to run from the date on which he is received at such jail or other place of detention".

Although this language may suggest that the defendant must be deemed to have begun serving his Federal sentence as soon as it was imposed, because he was thereupon committed to the custody of the Metropolitan Correctional Center to await transportation to a Federal penitentiary, we agree with the court in *Lublin v Johnson* (628 F Supp 1496 [ED NY 1986]) which held that such an interpretation would not be consonant with the policies underlying the IAD. In *Lublin v Johnson (supra,* at 1499-1500), the court stated that "[t]he IAD was enacted for a specific and limited purpose: the minimization of interference 'with a prisoner's treatment and rehabilitation.' *United States ex rel. Esola v Groomes,* 520 F. 2d 830, 833 (3d Cir, 1975). A detainer lodged against a prisoner can affect adversely a prisoner's treatment and rehabilitation only upon his entry into the assigned facility. Accordingly, petitioner began serving a term of imprisonment upon formally

entering the Lewisburg Federal Facility * * * and not on the effective date of sentencing under Section 3568 [of title 18 of the United States Code]" (citing *United States v Wilson,* 719 F2d 1491, 1494-1495, n 1; *see also, Crooker v United States,* 814 F2d 75, 77-78; *United States v Glasgow,* 790 F2d 446, 448-450; *Matter of Cresong v Nevil,* 51 AD2d 1096).

There is no issue of fact concerning whether, in the present case, the defendant benefited from any programs of rehabilitation while being held at the Metropolitan Correctional Center. The defendant's attorney made a conclusory allegation in his affidavit in support of the motion to dismiss the indictment that the defendant was "not allowed certain privileges" at the Metropolitan Correctional Center. Since there is no documentation to support this assertion, it cannot be based upon the personal knowledge of the affiant, and the source of such hearsay information is not stated, this assertion may be completely discounted *(see,* CPL 210.45 [1] [sources of statements made upon information and belief in support of motion to dismiss indictment must be set forth]). The affirmation in opposition submitted by the Assistant District Attorney, which did contain factual allegations in accordance with CPL 210.45 (1), establishes that the defendant "lost no privileges at Metropolitan Correctional Center nor was he interfered with in any way [as a result of the warrant] while awaiting * * * his [transfer to another prison]". Further, that affirmation establishes that "[s]ince MCC was a temporary holding facility for the prisoner he would not have entered upon any training or rehabilitative programs".

We conclude, in accordance with the foregoing, that the defendant did not begin serving his Federal sentence until subsequent to July 20, 1984, when he was transported from the Metropolitan Correctional Center to the penitentiary. For this reason alone, the speedy trial time constraints of CPL 580.20, article IV (c) did not come into play.

### B

■ The second necessary component of the defendant's argument, that is, that the filing of an arrest warrant with the United States Marshal's office on July 3, 1984, constituted the lodging of a detainer as of that date, is also ill founded. Even assuming that the warrant constituted a "detainer", we determine that it was not, as of July 3, 1984, "lodged against" the defendant.

In *Carchman v Nash* (473 US 716, 719, *supra),* the court defined the term "detainer" as "a request filed by a criminal justice agency with the institution in which a prisoner is incarcerated, asking the institution either to hold the prisoner for the agency or to notify the agency when release of the prisoner is imminent". In *United States v Ford* (550 F2d 732, 736, n 5, *affd sub nom. United States v Mauro,* 436 US 340), the court noted that "[w]arrants are commonly used as detainers." Also, in *People v Torres* (60 NY2d 119, 123), a warrant was apparently considered to be the equivalent of a detainer for the purposes of article III of the IAD. We may assume therefore, without deciding, that the arrest warrant presented to Federal authorities on July 3, 1984, was, in fact, a "detainer".

In order for the time limitations of article IV (c) to become operative, it is necessary that the detainer be "lodged" against the prisoner *(see,* CPL 580.20, art IV [a], [c]). We consider a detainer to have been lodged only when it is presented to the officials in charge of the penal institution at which the defendant is incarcerated. Only then will the existence of the detainer have all of the consequences to the prisoner which it is the supposed purpose of the IAD to minimize. Obviously, for example, if a prisoner is held at one prison within a given jurisdiction, the filing of a detainer at some different prison, or at some other location, would not necessarily have any effect on the prisoner's treatment. There is no proof whatsoever in the present record that the officers of the United States Marshal's office in Brooklyn, with whom the "detainer" was filed on July 3, 1984, were in any way responsible for the care and treatment of the defendant at the Metropolitan Correctional Center in New York County. Once again, the hearsay affidavit of the defendant's counsel is inadequate in this regard *(see,* CPL 210.45 [1]), and the opposing affirmation establishes that no measures could have been taken at the Metropolitan Correctional Center with respect to the defendant's treatment until July 20, 1984, at the earliest (although, even as of that date, the warrant had no effect on the defendant's treatment). There is, therefore, no proof that any "detainer" was "lodged" as early as July 3, 1984, particularly in light of the uncontradicted evidence that the "detainer" was not received at the Metropolitan Correctional Center until July 20, 1984.

We conclude that the defendant failed to allege facts in his moving papers sufficient to warrant a finding that a detainer

was lodged *before* the order to produce was issued on July 10, 1984. Since article IV (a) of the IAD (CPL 580.20, art IV [a]) requires that the detainer be filed *before* the "written request for temporary custody" is made, or at least before the defendant is produced, it has been held that the IAD is inapplicable where the detainer is lodged after the defendant's production *(see, United States v Roy,* 771 F2d 54, 58, *cert denied* 475 US 1110). It is beyond dispute that, had no detainer been "lodged" prior to the issuance of the order to produce on July 10, 1984, the speedy trial provisions of article IV (c) of the IAD would not be effective. For this additional reason, then, we reject the defendant's argument that the present indictment must be dismissed.

## C

The third critical component of the defendant's argument is that the Supreme Court's issuance on July 10, 1984, of an order to produce him which, in substance, constituted the issuance of a writ of habeas corpus *ad prosequendum* pursuant to CPL 580.30 (1) (b), was tantamount to the transmission to the appropriate Federal authorities of a "written request for temporary custody" pursuant to article IV (a) of the IAD (CPL 580.20, art IV [a]). The defendant's position in this regard is on somewhat firmer ground.

Were we presented with a question of State law, and not constrained by Federal authorities, we would be free to hold that the issuance by a State court of a writ of habeas corpus *ad prosequendum* is *not* the equivalent of the filing of a written request for temporary custody pursuant to the IAD. We see no valid basis whatsoever for the confusion of treating these two distinct procedures as a single entity, as these procedures were enacted as completely separate avenues pursuant to which prisoners in other jurisdictions could be compelled to appear in New York. The authority for a writ of habeas corpus *ad prosequendum,* which can be used only with respect to Federal prisoners, was first enacted in 1970 (L 1970, ch 996) as an alternative to the IAD.

However, *United States v Mauro* (436 US 340, *supra)* holds that a writ of habeas corpus *ad prosequendum,* at least one issued by a Federal court to obtain the presence of a State prisoner *(see,* 28 USC § 2241 [c] [5]), is the equivalent of a written request for temporary custody pursuant to article IV (a) of the IAD, provided that it has been preceded by the

lodging of a detainer. We are apparently bound by this holding, since the Supreme Court has determined that the IAD is the type of interstate compact which is subject to congressional approval pursuant to the Federal Constitution (US Const, art I, § 10 [3]), so that its construction is a question of Federal rather than State law (see, Cuyler v Adams, 449 US 433, supra).

We would note, however, that it is not certain whether the rule of United States v Mauro (supra) which, in effect, places certain limitations and conditions on the use of the Federal writ of habeas corpus ad prosequendum, applies with equal force to cases such as the one at bar, in which it is contended that the issuance of a State writ of habeas corpus ad prosequendum, under certain circumstances, triggers the applicability of the IAD (see, e.g., Moore v Whyte, 164 W Va 718, 266 SE2d 137, 141 [1980] [holding that a State writ of habeas corpus ad prosequendum is equivalent to written requests which activate the terms of article IV of the IAD, but apparently holding that Mauro does not compel such a result]). However, this court has previously followed the reasoning of United States v Mauro (supra) with regard to the issuance of a State rather than Federal writ of habeas corpus ad prosequendum (see, e.g., People v Sorenson, 80 AD2d 878). Since the People do not argue to the contrary, we may assume, without necessarily deciding, that the issuance of the order to produce the prisoner in this case was, in effect, the issuance of a writ of habeas corpus ad prosequendum (CPL 580.30 [2]) and that the issuance of such a State writ constituted the transmission of a "written request for temporary custody" pursuant to article IV (a) of the IAD (CPL 580.20, art IV [a]).

■ However, even if we were to assume, contrary to much of the foregoing analysis, that (1) the defendant was already serving his Federal prison sentence as of July 2, 1984, and (2) that a "detainer" had been "lodged" against him on July 3, 1984, and (3) that, in effect, a written request for defendant's production in State court was made on July 10, 1984, we would nonetheless conclude that the defendant's appearance in State court on July 12, 1984, did not constitute defendant's "arrival" in the State of New York within the meaning of article IV (c) of the IAD (CPL 580.20, art IV [c]).

As has been repeatedly stated above, the essential purpose of the Interstate Agreement on Detainers is to prevent or minimize the interference with a prisoner's program of rehabilitation which might result from the efforts of other jurisdic-

tions to obtain his presence at trial. Obviously, when the defendant is produced out of prison not for an extended period of time, but only for a brief period of time in connection with some incidental court appearance, the policy underlying the IAD is not implicated.

In *United States v Chico* (558 F2d 1047, 1049), the Second Circuit stated that article IV (e) of the IAD (CPL 580.20, art IV [e]) "does not apply to a case where a prisoner is removed from the prison of [one jurisdiction] for a few hours to be arraigned, plead and be sentenced in [another jurisdiction] without ever being held at any place of imprisonment other than that of the sending [jurisdiction] and without interruption of his rehabilitation there" *(see also, United States v Roy,* 771 F2d 54, 59, *supra).* By similar reasoning, we conclude that the speedy trial provisions of the IAD are not activated when a prisoner of one jurisdiction is produced, for a short period of time, in the court of another jurisdiction, such as in the instant case where the defendant did not have to spend a night in a different prison. In short, the speedy trial constraints of article IV (c) of the IAD are not involved when a prisoner makes a brief appearance in the court of another jurisdiction, without an actual interruption of his program of rehabilitation *(see, United States v Chico, supra; United States v Roy, supra; see also, People v Lublin,* 62 AD2d 1022; *People v Conway,* 65 AD2d 580; *Lublin v Johnson,* 628 F Supp 1496, *supra; United States v Boyce,* 518 F Supp 862, 864, *affd* 681 F2d 817; *Hitchcock v United States,* 580 F2d 964, 966; *Sassoon v Stynchombe,* 654 F2d 371, 374-375; *State v Sassoon,* 240 Ga 745, 242 SE2d 121; *contra, United States v Thompson,* 562 F2d 232; *United States v Schrum,* 638 F2d 214).

For all of the foregoing reasons, we find the defendant's contention that his rights under the Interstate Agreement on Detainers were violated is without merit.

IV

The defendant also contends that a new trial is necessary because the trial court failed to instruct the jury with respect to the elements of the crime of manslaughter in the first degree (Penal Law § 125.20 [1]). The defendant argues that, viewing the evidence in a light most favorable to him, the jury could have decided that he was not guilty of murder in the second degree, but was guilty of manslaughter in the first degree.

■ The defendant's argument on this score is completely without merit. A review of the record indicates that at no point did the defense counsel request that the court submit manslaughter in the first degree as a lesser included offense. "In the absence of such a request, the court's failure to submit such offense does not constitute error" (CPL 300.50 [2]; *see, e.g., People v Weibke,* 119 AD2d 890; *People v Charles,* 111 AD2d 405).

V

■ The defendant's final argument is that the imposition of the maximum sentence of 25 years to life imprisonment was unduly harsh under the circumstances. The only factor which might conceivably mitigate the defendant's culpability is his claim that he was under the influence of narcotics at the time that he intentionally murdered the victim. This factor is more than outweighed by the consideration that the defendant's homicidal behavior did not constitute an isolated act of criminality, but was part of an obvious pattern of violent and antisocial behavior, as exemplified by his Federal bank robbery conviction. The People of this State deserve to be protected, for as long a time as possible, from the threat to the safety of their lives and property which this defendant obviously represents.

The judgment appealed from should, accordingly, be affirmed.

KUNZEMAN, EIBER and HARWOOD, JJ., concur.

Ordered that the judgment is affirmed.